**Engin YESIL, Petitioner,**

v.

**Janet RENO, Attorney General, et al., Respondents.**

**No. 96 Civ. 8409(DC).**

United States District Court, S.D. New York.

July 14, 1997.

---

Michael P. DiRaimondo, Marialaina L. Masi, New York City and Thomas E. Moseley, Newark, NJ, for Petitioner.

Mary Jo White, U.S. Atty. for Southern District of New York by James A. O'Brien III, Sp. Asst. U.S. Atty., Diogenes P. Kekatos, Pierre M. Gentin, Asst. U.S. Attys., New York City, for Respondents.

Lucas Guttentag, Lee Gelernt, Laura L. Ho, New York City, for Amicus Curiae American Civil Liberties Union Foundation, Immigrants' Rights Project.

Helaine Barnett, Scott Rosenberg, New York City and Manuel D. Varas, New York City, for Amicus Curiae Legal Aid Society of New York City.

## OPINION

CHIN, District Judge.

On February 27, 1997, I issued an opinion in this case granting Engin Yesil's petition for a writ of habeas corpus. *Yesil v. Reno,* 958 F.Supp. 828 (S.D.N.Y.1997). I held that sections 401(e) and 440(a) of the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA") did not deprive the district courts of habeas corpus jurisdiction to review final orders of deportation of aliens in custody in violation of the Constitution or laws of the United States. I granted the petition because I concluded that the Board of Immigration Appeals (the "BIA") had erred in holding that Yesil was ineligible to be considered for a waiver of deportation under section 212(c) of the Immigration and Nationality Act, as amended (the "INA"), 8 U.S.C. § 1182(c), because he had not been a lawful permanent resident for seven years at the time he applied.

On March 10, 1997, the Government moved for reconsideration of my opinion based on a decision of the Attorney General of the United States issued on February 21, 1997. *Matter of Soriano,* slip op. (Atty.Gen. Feb. 21, 1997). Reversing an *en banc* decision of the Board of Immigration Appeals (the "BIA"), Interim Decision No. 3289, 1996 WL 426888 (BIA June 27, 1996), the Attorney General held in *Soriano* that section 440(d) of the AEDPA applies to applications for section 212(c) relief submitted prior to April 24, 1996, the effective date of the AEDPA. Section 440(d), as amended by section 306(d) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104–208 (the "IIRIRA"), renders ineligible for section 212(c) relief aliens convicted of certain crimes, including aggravated felonies.

The Government argues in essence that the issues addressed in my February 27, 1997 opinion are irrelevant and that, in accordance with the Attorney General's decision in *Soriano,* Yesil—as a convicted aggravated felon—is ineligible under section 440(d) for section 212(c) relief, no matter how many years he has been a lawful permanent resident, no matter how many consecutive years he has been a lawful domicile. The Government takes this position even though section 440(d) did not become law until more than two years after deportation proceedings had been commenced against Yesil, and even though Yesil would have been considered for section 212(c) relief before the AEDPA took effect had the Immigration Judge (the "IJ") and BIA not erroneously declared him ineligible on other grounds during the deportation proceedings. The Government argues that because section 440(d) renders Yesil statutorily ineligible for section 212(c) relief, Yesil cannot show a "threat of a fundamental miscarriage of justice" entitling him to habeas corpus relief.

In its reply memorandum, the Government further argues—in a display of sheer arrogance—that even if I were to deny its present motion for reconsideration, the Immigration and Naturalization Service ("INS") could nonetheless proceed to deport Yesil on grounds that the Government has yet to raise. Even though the Government has moved for reconsideration on the basis of *Soriano,* the Government suggests in its reply memorandum that all of the issues now before me would be academic if I were to reject its arguments because—"regardless of the Attorney General's decision in *Soriano* "—INS could simply terminate the instant deportation proceedings and "reinitiate removal proceedings" against Yesil pursuant to section 309(c)(3) of the IIRIRA. (Govt. Reply Mem. at 28). Hence, the Government is suggesting that it is holding in reserve yet another card, a card that it will play if its present motion for reconsideration is denied.

The Government's arguments are rejected. Yesil has shown a "threat of a fundamental miscarriage of justice," and I hold that section 440(d) of the AEDPA may not be lawfully applied to applications for section 212(c) relief pending when the AEDPA was signed into law. Moreover, the Government may not circumvent my rulings by now relying on section 440(d), even if it may be applied to pending cases generally, or section 309 of the IIRIRA or any other newly enacted provision of law. Yesil is entitled to a hearing on the merits on his section 212(c) application. Accordingly, the motion for reconsideration is denied in all respects.

## BACKGROUND

### A. *Facts and Procedural History*

The facts and procedural history are set forth in detail in my February 27, 1997 opinion and will not be repeated here.

In my February 27th opinion, I held that this Court had personal jurisdiction over the district director of INS in Louisiana, that the abuse of writ doctrine was not a bar to Yesil's seeking relief in these proceedings, that sections 401(e) and 440(a) of the AEDPA did not deprive the district courts of subject matter jurisdiction to entertain challenges to final deportation orders brought by petitions for writ of habeas corpus pursuant to 28 U.S.C. § 2241, and that the IJ and BIA had erred in holding that Yesil was not eligible to be considered for section 212(c) relief because he had not been a lawful permanent resident for seven years. In the latter respect, I held that Yesil was eligible to be considered because he had been lawfully domiciled in the United States for seven continuous years and was a lawful permanent resident at the time of his application.

The issues raised by the present motion for reconsideration were not reached in my February 27th opinion because, as the Government stated at page 43, footnote 15 of its January 30, 1997 memorandum of law in opposition to the petition, the Attorney General was still then "considering whether to apply AEDPA § 440(d) to 212(c) applications filed before April 24, 1996."

The Attorney General decided that question when she issued her opinion in *Soriano* on February 21, 1997, six days prior to the issuance of my opinion in this case. The United States Attorney's Office for the Southern District of New York, however, did not learn of the Attorney General's decision until March 3, 1997. The Government filed the instant motion for reconsideration on March 10, 1997.

### B. *Section 440(d)*

The AEDPA was signed into law by the President on April 24, 1996. Section 440(d) of the AEDPA amended section 212(c) of the INA, a long-standing "humane provision" of law that gave lawful permanent residents the right to seek relief if they became subject to deportation because they were convicted of a crime. *Lok v. INS,* 548 F.2d 37, 39 (2d Cir.1977). In applying for a section 212(c) waiver, a lawful permanent resident could point to factors such as ties to the United States, the effect of deportation on the individual's family, proof of rehabilitation, service to the community, and other evidence of good character.

Section 440(d) sharply limited section 212(c) by barring relief for individuals who were deportable because they had committed certain categories of offenses,[1] including: (1) an aggravated felony; (2) a controlled substance violation; (3) a firearm offense; (4) one of various miscellaneous crimes; or (5) two or more crimes involving "moral turpitude." Hence, lawful permanent residents

---

1. Section 440(d) amended section 212(c) to read as follows:

    Aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General.... Nothing contained in this subsection shall limit the authority of the Attorney General to exercise the discretion invested in [her] under section 211(b). *This section shall not apply to an alien who is deportable by reason of having committed any criminal offense covered in section 241(a)(2)(A)(iii), (B), (C), or (D), or any offense covered by section 241(a)(2)(A)(ii) for which both predicate offenses are, without regard to the date of their commission, otherwise covered by section 241(a)(2)(A)(i).*

    INA § 212(c), as amended by AEDPA § 440(d), as further amended by IIRIRA § 306(d) (emphasis added). The underscored language replaced language disqualifying from section 212(c) relief aliens convicted of aggravated felonies for which they had served a term of imprisonment of at least five years. The boldfaced language was added by section 306(d) of the IIRIRA in what was labelled a "technical amendment." Pub.L. 104–208, Div. C, 110 Stat. 3009–612(Sept. 30, 1996).

    Section 212(c) was repealed, effective April 1, 1997, by section 304(b) of the IIRIRA. The IIRIRA replaced section 212(c) relief with a new form of relief for lawful permanent residents, called Cancellation of Removal, designated section 240A(a) of the INA. *See* IIRIRA § 304(a)(3).

convicted of one of these offenses were no longer eligible for section 212(c) relief, no matter how many years they had been lawfully domiciled in this country.[2]

Section 440(d) is silent as to whether it applied to pending cases. INS took the position, however, that section 440(d) applied to all deportation cases pending when the AEDPA took effect, as well as, of course, to deportation cases subsequently commenced. This set the stage for the resolution of the issue in *Matter of Soriano*.

## C. *Soriano*

### 1. *The BIA's Decision*

Bartolome Jhonny Soriano arrived in the United States as a lawful permanent resident in March 1985. In May 1992, he was convicted of attempted criminal sale of a controlled substance. On the basis of that conviction, INS commenced deportation proceedings against him. During the course of the proceedings, Soriano applied for section 212(c) relief. In October 1995 the IJ found that Soriano was eligible for section 212(c) relief, but denied the application in the exercise of his discretion.

Soriano appealed to the BIA. Thereafter, while the appeal was pending, the AEDPA became law. Although Soriano had been eligible for section 212(c) relief when he requested the waiver, under section 440(d) he would no longer be eligible because his conviction fell within one of the categories covered by section 440(d). INS took the position before the BIA that section 440(d) applied to pending applications and thus it argued that Soriano was barred from seeking section 212(c) relief.

The six-member majority disagreed. First it concluded, however, that Congress did not expressly provide for an effective date for

section 440(d). *Matter of Soriano*, Interim Decision No. 3289, 1996 WL 426888 (BIA June 27, 1996) (hereafter cited as "Int. Dec."). Because Congress had expressly provided for a delayed effective date for other provisions of the AEDPA, the majority held that Congress had intended that section 440(d) be applied immediately upon enactment of the AEDPA, including as a general matter to aliens already in deportation proceedings at the time. (Int. Dec. at 4–5).

The next question addressed by the majority was whether section 440(d) applied to aliens already in deportation proceedings who had applications for section 212(c) relief pending on April 24, 1996. The majority determined that Congress had not intended for section 440(d) to apply to pending applications. The majority relied on the fact that section 413 of the AEDPA, which barred alien terrorists from seeking most forms of relief from deportation, expressly provided that it applied to "applications filed before, on, or after" the effective date of the AEDPA, so long as "final action" had not been taken. AEDPA § 413(g). The majority concluded that the presence of this language in section 413(g) together with the absence of comparable language in section 440(d) showed that Congress had not intended for section 440(d) to apply to applications filed before the AEDPA was enacted. (Int. Dec. at 6–7).

The majority also drew support from the Supreme Court's admonition in *Landgraf v. USI Film Products*, 511 U.S. 244, 265, 114 S.Ct. 1483, 1497, 128 L.Ed.2d 229 (1994), that "settled expectations should not be lightly disrupted." The majority held that "[b]y applying section 440(d) of the AEDPA to only those applications for section 212(c) relief filed on or after the date of enactment of the AEDPA, the unique expectations of aliens whose applications for section 212(c)

---

**2.** Under these provisions, "a legal permanent resident convicted of one minor drug possession charge, or two misdemeanor petty theft or public transportation fare evasion charges—turnstile jumping in the New York City subway system leading to a 'theft of services' misdemeanor conviction is considered a crime of 'moral turpitude'—is now subject to automatic deportation without any opportunity to [apply for section 212(c) relief]." *Mojica v. Reno*, Nos. 97 CV

1085, 97 CV 1869(JBW), 1997 WL 357808, at *3 (E.D.N.Y. June 24, 1997).

On July 3, 1997, Judge Weinstein issued an amended opinion amending and superseding his June 24, 1997 opinion. The July 3, 1997 opinion is not yet available on-line. The Court has been advised, however, that the changes are entirely nonsubstantive in nature and thus it will rely on the June 24, 1997 version.

relief were pending prior to the enactment of the AEDPA are not disrupted." (Int. Dec. at 7). The majority concluded that these aliens had the "expectation that although they were deportable under various provisions of the [INA], they would be able to present evidence of favorable social and humane considerations that might countervail evidence of their undesirability as lawful permanent residents." (*Id.*).

Finally, on the merits of the appeal, the majority concluded that the IJ had properly exercised his discretion in denying Soriano's application for section 212(c) relief. (Int. Dec. at 8–9).

One member of the BIA concurred in part and dissented in part. Board Member Lory D. Rosenberg concurred in the majority's holding that section 440(d) was not applicable to pending applications for section 212(c) relief. She dissented, however, from the majority's conclusion that section 440(d) could otherwise be applied to deportation proceedings commenced before April 24, 1996, where the alien had not yet applied for section 212(c) relief. (Int. Dec. at 10, 12, 20).

The five dissenting members disagreed with the majority's conclusion that section 440(d) applied to pending applications. The dissent was of the view that a section 212(c) application is an "ongoing application" and that an applicant for such relief had to qualify under the law in existence "at the time the application is finally considered." (Int. Dec. at 22). The dissent also concluded that "[l]ike injunctive relief, relief from deportation under section 212(c) of the [INA] is prospective in nature." (*Id.* at 23). Hence, the dissent was of the view that section 440(d) did not operate "retroactively." (*Id.* at 22–23). The dissent also held that "applying the amended section 212(c) provisions to pending applications does not offend any of the concerns underlying the retroactive operation of new statutes." (*Id.* at 23).

### 2. *The Attorney General's Decision*

The Commissioner of INS referred the *Soriano* decision to the Attorney General for review pursuant to 8 C.F.R. § 3.1(h)(iii). On September 12, 1996, the Attorney General issued an order vacating the BIA's decision in *Soriano* and accepting the matter for review. On February 21, 1997, the Attorney General issued her decision, reversing the BIA and holding that section 440(d) was to be applied to section 212(c) applications pending on April 24, 1996. *Matter of Soriano,* slip op. (Atty.Gen. Feb. 21, 1997) (hereafter cited as "Atty. Gen. Dec.").

The Attorney General decision began its analysis with a discussion of *Landgraf.* As to the threshold question of whether Congress had "expressly prescribed the statute's proper reach," *Landgraf,* 511 U.S. at 280, 114 S.Ct. at 1505, the Attorney General wrote:

nothing in the language of the newly enacted statute, AEDPA § 440(d), specifies either that it is to be applied in pending deportation proceedings, or that it is not to be.

(Atty. Gen. Dec. at 3). The Attorney General's decision does not analyze any of the text of the AEDPA or its legislative history.

The Attorney General then proceeded to discuss whether "the statute would be given retroactive effect if applied in pending deportation proceedings." (Atty. Gen. Dec. at 3). The Attorney General concluded that it would not, because "[t]he relief sought in a section 212(c) application ... is prospective in nature." (*Id.* at 5). The Attorney General expressed her view that section 440(d), by eliminating her discretion to grant relief in certain cases, merely had the effect of removing jurisdiction. (*Id.*). Because a section 212(c) waiver was "purely discretionary relief from the immigration consequences of a prior criminal conviction," the Attorney General stated that it could not be properly characterized as a "substantive right." (*Id.* at 5–6). Hence, the Attorney General concluded that because section 440(d) merely altered jurisdiction and limited the availability of "future relief," it should be applied to pending applications for section 212(c) relief. (*Id.* at 5). Finally, to address the concern that certain aliens might have conceded deportability before the AEDPA was passed in reliance on the availability of section 212(c) relief, the Attorney General held that aliens with a colorable defense to deportability could peti-

tion to reopen cases for the limited purpose of contesting deportability. (*Id.* at 8).

## DISCUSSION

### A. *Applicable Legal Standards*

In *Landgraf v. USI Film Products*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), the Supreme Court reiterated the long-standing principle that laws generally should not be given retroactive effect, as it confirmed that "the presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic." *Id.* at 265, 114 S.Ct. at 1497. At the same time, the Court acknowledged the "apparent tension" between the axiom that " '[r]etroactivity is not favored' " and the rule that " 'a court is to apply the law in effect at the time it renders its decision.' " *Id.* at 264, 114 S.Ct. at 1496 (quoting *Bradley v. School Bd. of City of Richmond*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974), and *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 471–72, 102 L.Ed.2d 493 (1988)).

■ *Landgraf* and other Supreme Court decisions suggest a three-step analysis for determining whether a newly enacted statute is to be applied to a pending case. First, the court "is to determine whether Congress has expressly prescribed the statute's proper reach." 511 U.S. at 280, 114 S.Ct. at 1505. If so, the inquiry need proceed no further and the court need not "resort to judicial default rules." *Id.*

Second, if "the statute contains no such express command, the court must determine whether the new statute would have retroactive effect." *Id.* The court does so by "ask[ing] whether the new provision attaches new legal consequences to events completed before its enactment," *id.* at 269–70, 114 S.Ct. at 1499, and by examining "whether [the statute] would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* at 280, 114 S.Ct. at 1505. In making this inquiry, "familiar considerations of fair notice, reasonable reliance, and

settled expectations offer sound guidance." *Id.* at 270, 114 S.Ct. at 1499. If the statute would operate "retroactively" under this analysis, then "our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result." *Id.*

■ Third, if a new statute does not have new legal consequences that have a "genuinely 'retroactive' effect," a presumption arises in favor of applying the new law to pending matters; that presumption, however, may be overcome if applying the new law "would result in manifest injustice or there is statutory direction or legislative history to the contrary.' " *Landgraf*, 511 U.S. at 277, 114 S.Ct. at 1503 (quoting *Bradley*, 416 U.S. at 711, 94 S.Ct. at 2016).

■ The Court in *Landgraf* also emphasized that in considering whether a new law should be applied to pending matters, a court should keep in mind that "application of new statutes passed after the events in suit is unquestionably proper in many situations." *Id.* at 273, 114 S.Ct. at 1501. Indeed, when the new statute "authorizes or affects the propriety of prospective relief," its application is "not retroactive." *Id.* Likewise, statutes "conferring or ousting jurisdiction" that " 'speak to the power of the court rather than to the rights or obligations of the parties' " generally do not raise concerns about retroactivity. *Id.* at 274, 114 S.Ct. at 1501–02 (quoting *Republic Nat'l Bank of Miami v. United States*, 506 U.S. 80, 99, 113 S.Ct. 554, 565, 121 L.Ed.2d 474 (1992) (Thomas, J., concurring)). Finally, "[c]hanges in procedural rules may often be applied in suits arising before their enactment" without violating the principle against retroactivity. *Id.* at 275, 114 S.Ct. at 1502. In reviewing these permissible applications of new laws to pending cases, however, the Supreme Court reaffirmed "the traditional presumption against applying statutes affecting substantive rights, liabilities, or duties to conduct arising before their enactment." *Id.* at 278, 114 S.Ct. at 1504.

Judge Weinstein recently applied *Landgraf* to the precise question of whether section 440(d) applies to applications for section

212(c) relief pending when the AEDPA became law. In *Mojica v. Reno*, Nos. 97 CV 1085, 97 CV 1869(JBW), 1997 WL 357808 (E.D.N.Y. June 24, 1997), Judge Weinstein held that section 440(d) may not be applied to pending cases.[3]

For the reasons set forth in Judge Weinstein's thorough and scholarly opinion, and for the reasons set forth below, I likewise hold that section 440(d) may not be applied to applications for section 212(c) relief pending when the AEDPA was signed into law.[4] First, the text of the AEDPA and its legislative history demonstrate that Congress did not intend for section 440(d) to apply to pending cases. Second, under the "judicial default" rules, section 440(d) would have retroactive effect, for it does attach new legal consequences to completed events and it disrupts the settled expectations of long-time lawful permanent residents. Third, even assuming section 440(d) does not have retroactive effect, it would be manifestly unjust to apply section 440(d) to Yesil, for his section 212(c) application would have been considered on the merits prior to the passage of the AEDPA had the IJ and the BIA not ignored well-settled Second Circuit law. Finally, the Government's argument that the Attorney General's decision is entitled to great deference is simply not persuasive.

## B. *Congressional Intent*

In trying to ascertain whether Congress intended for section 440(d) to apply to pending cases, we must look first at the text of the AEDPA and then at its legislative history. In her decision, the Attorney General did not discuss the language of the statute, other than to conclude in one sentence that "nothing in the language of the newly enacted statute, AEDPA § 440(d), specifies either that it is to be applied in pending deportation proceedings, or that it is not to be." (Atty.

Gen. Dec. at 3). The decision fails to discuss the legislative history of the AEDPA at all.

### 1. *The Text*

Although the Attorney General correctly observes that section 440(d) contains no language addressing its applicability to pending cases, other provisions of the AEDPA do provide guidance. Most notably is section 413, entitled "Denial of Other Relief for Alien Terrorists," which eliminates certain relief from deportation for alien terrorists. Subsection (g), entitled "Effective Date," provides:

> The amendments made by this section shall take effect on the date of the enactment of this Act and shall apply to applications filed *before, on, or after* such date if final action has not been taken on them before such date.

AEDPA § 413(g), 110 Stat. 1269 (emphasis added). Hence, when Congress wanted the provisions of section 413 to apply to an alien terrorist whose application for relief from deportation had been filed "before" the effective date of the AEDPA, it said so explicitly.

Section 440(d) is similar to section 413 in that it also limits the ability of an alien convicted of certain crimes to obtain relief from deportation. Although, as section 413(g) demonstrates, Congress obviously knew how to make explicit its desire to apply provisions of the new law to pending cases, it chose not to do so with respect to section 440(d).

Congress also expressly elected to make section 401, which enacted new alien terrorist removal procedures, applicable to prior conduct and events. Section 401(f) expressly provides that section 401 "shall take effect on the date of enactment of this Act and shall apply to all aliens without regard to the date of entry or attempted entry into the United States." AEDPA § 401(f), 110 Stat. 1268. Congress also made several other provisions

---

3.  Cf. *Buitrago–Cuesta v. INS*, 7 F.3d 291, 294–95 (2d Cir.1993) (holding that section 511(a) of the Immigration Act of 1990, which amended section 212(c) to eliminate eligibility for aliens convicted of aggravated felonies who served at least five years in prison, applied retroactively, because "plain language of the statute indicates a congressional intent that § 511 apply retroactively,"

and in view of fact that failure to apply section 511(a) retroactively would yield absurd result that the provision would not take effect until three or five years after its enactment).

4.  Accordingly, I do not reach plaintiff's equal protection argument.

applicable to proceedings initiated on or after the date of enactment, thus clearly providing that the proceedings could be based on conduct or events occurring before the AEDPA took effect. *See, e.g.,* AEDPA §§ 421(b), 435(b), 440(f), 441(b), 110 Stat. 1270, 1275, 1278, 1279. *See Mojica v. Reno,* Nos. 97 CV 1085, 1869(JBW), 1997 WL 357808, at *45–46 (E.D.N.Y. June 24, 1997). Yet, Congress included no comparable or similar language in section 440(d).

The Supreme Court's most recent discussion of the principles to be applied in determining the retroactive effect of new statutes is instructive, particularly since it concerned the very statute before us—the AEDPA. In *Lindh v. Murphy,* — U.S.—, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), the Court was confronted with the issue of whether the amendments to Chapter 153 of Title 28 of the United States Code, enacted by sections 101 to 106 of the AEDPA, applied to cases pending when the AEDPA was enacted. The Court held that they did not, largely because section 107(c) of the AEDPA, which created a new set of rules for habeas corpus proceedings in capital cases (Chapter 154 of Title 28), expressly provided that "Chapter 154 . . . shall apply to cases pending on or after the date of enactment." AEDPA § 107(c), 110 Stat. 1226. The Court held:

> We read this provision of § 107(c), expressly applying chapter 154 to all cases pending at enactment, as indicating implicitly that the amendments to chapter 153 were assumed and meant to apply to the general run of habeas cases *only when those cases had been filed after the date of the [AEDPA].*

— U.S. at —, 117 S.Ct. at 2063 (emphasis added). The Court concluded:

> We hold that the negative implication of § 107(c) is that the new provisions of chapter 153 generally apply only to cases filed after the [AEDPA] became effective.

*Id.* at —, 117 S.Ct. at 2068.

Here, the "negative implication" of sections 401(f), 413(g), 421(b), 435(b), 440(f), and 441(b) is that section 440(d) applies only to applications filed after the AEDPA became effective. If Congress had intended for section 440(d) to apply to pending applications,

it is reasonable to assume that Congress would have expressly provided for section 440(d) to apply to pending applications. Moreover, the AEDPA was enacted just two years after the Supreme Court decided *Landgraf.* Hence, it is reasonable to assume that Congress was well aware of the teachings of *Landgraf*—including its admonition that Congress should be explicit when it intended a new law to apply to pending cases— when it elected not to explicitly make section 440(d) applicable to pending cases. *See Lindh,* — U.S. at — – —, 117 S.Ct. at 2063–64 (Congress "could have taken" *Landgraf* as "counseling the wisdom of being explicit if it wanted [the new section 2254(d) ] to be applied to cases already pending").

■ The Government contends that the negative implication argument is "meritless," pointing out in its reply brief that certain provisions of the AEDPA mandate only prospective application. (Govt. Reply Mem. at 6) (citing AEDPA sections). The Government's suggestion that the negative implication argument is "meritless" is simply wrong, as *Lindh* makes clear. Indeed, in its reply brief, which was filed before the Supreme Court decided *Lindh,* the Government relies on the Seventh Circuit's decision reversed by the Supreme Court in *Lindh.* *Lindh v. Murphy,* 96 F.3d 856 (7th Cir.1996), *rev'd,* — U.S. —, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Moreover, the Government's argument ignores the deep-rooted tradition against retroactivity that the Court reaffirmed, once again, in *Lindh* in discussing the very statute at issue here—the AEDPA. *See also Hughes Aircraft Co. v. United States ex rel. Schumer,* — U.S. —, — – —, 117 S.Ct. 1871, 1874–75, 138 L.Ed.2d 135 (1997) (also reaffirming the "'presumption against retroactive legislation [that] is deeply rooted in our jurisprudence'") (quoting *Landgraf*).

In sum, the text of the AEDPA demonstrates Congress's clear intent that section 440(d) not be applied to pending cases.

## 2. *The Legislative History*

■ To the extent that any doubt remains after an analysis of the text of the AEDPA,

that doubt is eliminated by an examination of its legislative history, which shows that Congress specifically considered—but ultimately rejected—a provision that would have made section 440(d) applicable to pending cases.

On May 25, 1995, one month after the Oklahoma City bombing, Senators Dole and Hatch introduced S. 735, the "Comprehensive Terrorism Prevention Act of 1995." The Act contained a number of provisions relating to immigration, including what would eventually become section 440(d). See 141 Cong. Rec. at S. 7559 (daily ed. May 25, 1995). Section 303(f) of that Act provided that "amendments made by this section shall ... apply to cases pending before, on or after" the date of enactment. Id. at S. 7863 (daily ed. June 7, 1995). Thus, the Senate's version of section 440(d) explicitly provided that it would apply to pending cases.

The House of Representatives adopted its own anti-terrorist legislation—H.R. 2703—in response to the Oklahoma City bombing. The House's version of section 440(d) also limited section 212(c) relief but it did not contain language making the section applicable to cases pending before its enactment. See 142 Cong. Rec. at H. 2295 (daily ed. March 14, 1996). Moreover, when the House considered the Senate's bill, the House insisted that its language limiting section 212(c) relief be substituted for the Senate's version and requested a conference on the point.

Thus, two competing versions of legislation limiting section 212(c) relief went to conference—one fully applicable to pending applications for section 212(c) relief, and the other containing no such provision. What emerged from conference, and what was ultimately passed as section 440(d) of the AEDPA, however, was a version of the bill that did not contain the Senate's explicit language of retroactivity. Although other changes were made to the Senate's version and other com-promises were struck, the retroactivity language was considered and rejected.

Taken together, the text of the AEDPA and its legislative history demonstrate unequivocally that Congress did not intend for section 440(d) to be applied to pending cases.

## C. Retroactive Effect

Under Landgraf, the inquiry need proceed no further, as Congress's intent is clear. Nonetheless, application of the "judicial default" rules only confirms that section 440(d) does have "retroactive effect" and that it may not be applied to pending cases. See generally Mojica, 1997 WL 357808, at *46–54.

■ Section 440(d) has retroactive effect. It attaches new legal consequences to events completed before its enactment, and it impairs important rights possessed by aliens at the time they acted and significantly increases their liability for that past conduct.

Prior to the passage of section 440(d), aliens who became deportable for committing certain crimes knew that there existed the possibility that if they mended their ways and turned over a new leaf, they might be able to obtain relief from deportation. Aliens who were, or with the passage of time would become, eligible for section 212(c) relief knew that if they could rehabilitate themselves, they would have the opportunity to seek relief from the harsh consequences of deportation.[5] Section 212(c) offered these individuals a concrete mechanism for obtaining relief; indeed, statistics submitted by The Legal Aid Society, as amicus curiae, show that in the six-year period from FY 1989 through FY 1994, section 212(c) applications were granted more often than they were denied.[6] Hence, section 212(c) offered these individuals a very real incentive to become productive members of society. Now, despite whatever efforts they might have made in reliance on the availability of

---

**5.** The Government's assertion that Yesil could not have had a "vested right" or "settled expectation" in section 212(c) relief for these purposes when he pled guilty in August 1990 (Govt. Mem. at 11) is rejected. Yesil certainly could have expected then that if he acknowledged his mistakes, pled guilty, cooperated with the Government to help atone for his crimes, and became a law-abiding and productive member of society, he could seek section 212(c) relief once he was lawfully domiciled for seven continuous years.

**6.** Of the approximately 20,000 applications during that time frame, some 8400 were granted and some 8100 were denied. The remainder fell into an "Others" category. (Legal Aid Mem., Exh. F).

section 212(c) relief, despite whatever "expectations" they might have had, the possibility of obtaining relief from deportation would be foreclosed completely if the Government's interpretation of section 440(d) is accepted.

The availability of relief from deportation—even the possibility thereof—is a critical factor to an alien who is considering whether to enter into a guilty plea. *See United States v. Del Rosario,* 902 F.2d 55, 61 (D.C.Cir.1990) (Mikva, J., concurring) ("The possibility of being deported can be—and frequently is—the most important factor in a criminal defendant's decision how to plead . . . ."), *cert. denied,* 498 U.S. 942, 111 S.Ct. 352, 112 L.Ed.2d 316 (1990); *Mojica,* 1997 WL 357808, at *49 ("For a non-citizen, the choice to forego trial and plead guilty is often critically dependent on information regarding possible immigration consequences."). An alien who decided to plead guilty to a crime that rendered him deportable might very well have done so with the expectation that if he rehabilitated himself and showed that he was deserving of a second chance, he would have the opportunity to seek relief from deportation by way of a section 212(c) application. On the other hand, if he had known that there was no possibility of relief from deportation, if he had known that it was a certainty that he would be banished from this country and separated from his family and friends, he might very well have come to a different conclusion.[7]

In *Soriano,* the Attorney General concluded that applying section 440(d) to pending cases would not have "retroactive effect" because section 212(c) relief is "purely discretionary relief" and not "a substantive right," and that section 440(d) is jurisdictional and prospective in nature. These arguments are rejected.

■ A right to discretionary relief is still a substantive right, and the elimination of even the possibility of obtaining relief thus has a retroactive effect. *See Warden, Lewisburg*

*Penitentiary v. Marrero,* 417 U.S. 653, 663, 94 S.Ct. 2532, 2538, 41 L.Ed.2d 383 (1974) (indicating that a statute taking away parole eligibility for offenses for which parole was available under the law in existence at the time the offenses were committed could be found to be constitutionally impermissible as an *ex post facto* law); *Lindsey v. Washington,* 301 U.S. 397, 401, 57 S.Ct. 797, 799, 81 L.Ed. 1182 (1937) (holding that a statute changing a maximum sentence to a mandatory sentence for offense committed prior to statute's enactment is an impermissible ex post facto law); *see Hincapie–Nieto v. INS,* 92 F.3d 27, 30 n. 2 (2d Cir.1996) (in dictum, stating: "We express no view as to the permissibly retrospective application of Section 440(d), which eliminates what is arguably a substantive right, albeit a right only to discretionary relief."). The simple fact is that many cases that would have resulted in a waiver of deportation before April 24, 1996 would have a different outcome under section 440(d)—certain deportation. Surely this is a substantive change.

■ Nor is section 440(d) merely jurisdictional in nature, and the Attorney General's argument to that effect is meritless. In this context, a jurisdictional change is one that changes the forum, or jurisdiction, for obtaining relief. A change that eliminates the *only* forum for obtaining the relief, that eliminates eligibility for obtaining the relief all together, cannot be merely jurisdictional. *See Landgraf,* 511 U.S. at 274, 114 S.Ct. at 1501–02 ("Application of a new jurisdictional rule usually 'takes away no substantive right but simply changes the tribunal that is to hear the case.'") (quoting *Hallowell v. Commons,* 239 U.S. 506, 508, 36 S.Ct. 202, 203, 60 L.Ed. 409 (1916)); *accord Hughes Aircraft Co.,* —— U.S. at —— ——, 117 S.Ct. at 1878–79 (jurisdictional statutes "merely address[] which court shall have jurisdiction," and "[s]uch statutes affect only where a suit may be brought, not whether it may be brought at all").

---

7. *See Mojica,* 1997 WL 357808, at *51 ("The importance of immigration consequences of pleas in criminal cases cannot be underestimated. Deportation to a country where a legal permanent resident of the United States has not lived since childhood; or where the immigrant has no family or means of support; or where he or she would be permanently separated from a spouse, children and other loved ones, is surely a consequence of serious proportions that any immigrant would want to consider in entering a plea.").

■ The Attorney General also concluded that because section 212(c) relief is "prospective in nature" and deportation is akin to an injunction, application of section 440(d) to pending cases is permitted under *Landgraf*. (Atty. Gen. Dec. at 5). The reference in *Landgraf* to injunctive relief, however, was to injunctive relief "in futuro," such as an ongoing injunction restraining unions from picketing. 511 U.S. at 273–74, 114 S.Ct. at 1501–02. This case is different. Section 440(d) does not affect injunctive relief with respect to future activity; to the contrary, it would alter the "legal consequences" of actions taken by Yesil some ten years ago.

Under the Attorney General's reasoning, any law that affects relief would act prospectively only, as the relief—whether an injunction or damages or relief from deportation—would be imposed or awarded in the future. This interpretation cannot be correct, as *Landgraf* itself demonstrates. *Landgraf* involved compensatory and punitive damages under the Civil Rights Act of 1991 to be awarded in the future. Yet, the Court held that the new law could not be applied to pending cases because it acted retroactively. 511 U.S. at 281–82, 114 S.Ct. at 1505–06.

Finally, as the inquiry here is essentially one of fairness, it is important to consider, from the Government's point of view, the rationale for applying section 440(d) to pending cases. In her decision, however, the Attorney General identified no such purpose; indeed, she made no effort to explain the purpose to be served by construing section 440(d) to apply to pending cases. *Mojica*, 1997 WL 357808, at *42–44. Nor does the Government now, on its motion for reconsideration, identify the purpose to be served by applying section 440(d) to pending cases, other than to state in a footnote in its reply brief that "insofar as the Government clearly has a legitimate interest in protecting society from criminal aliens, section 440(d) is a plainly rational means of furthering that interest." (Govt. Reply Mem. at 11 n. 2). While that general statement is true as far as it goes, it does not purport to articulate any rational basis for applying retrospectively a provision of law that cuts off an alien's ability to show that he or she has reformed and eliminates

his or her incentive to do so. On the other hand, as discussed above, there are compelling reasons not to apply section 440(d) to pending cases. Hence, application of the judicial default rules enunciated in *Landgraf* shows that section 440(d) has retroactive effect.

## D. *Manifest Injustice*

■ Even assuming section 440(d) does not have retroactive effect and that it should be applied to pending cases in general, it would be manifestly unjust to apply section 440(d) to Yesil. When the BIA issued its final order of deportation in March 1995, Yesil was eligible for section 212(c) relief under well-settled Second Circuit law. Yet, the IJ and BIA erroneously held that he was not. If they had applied the law properly, Yesil's section 212(c) application would have been considered on the merits—before the AEDPA became law on April 24, 1996 or certainly before the Attorney General issued her decision on February 21, 1997 holding that section 440(d) should be applied to pending cases. Hence, fairness requires that Yesil be returned to the position he would have been in had the law properly been applied by the IJ and BIA. If my initial decision is affirmed, regardless of the applicability of section 440(d) to pending cases as a general matter, fairness requires that Yesil's application be considered on the merits—as it should have been in 1995.

## E. *Deference*

■ Finally, the Government contends that this Court's review of the Attorney General's decision must be limited by the deference courts owe to administrative tribunals in their interpretations of statutory law. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984); *see Scheidemann v. INS*, 83 F.3d 1517, 1523 (3d Cir.1996). While I agree with the proposition that administrative agencies should be accorded deference in their interpretation of statutes they are charged with implementing, that proposition has no bearing on the issue at hand.

The Attorney General's opinion in this matter involved no "statutory interpretation." The Attorney General did not analyze the text of the AEDPA or discuss its legislative history in deciding that section 440(d) should apply to pending section 212(c) applications. Indeed, the Attorney General came to the conclusion that "nothing in the language of ... § 440(d) specifies that it is to be applied in pending deportation proceedings, or that it is not to be." (Atty. Gen. Dec. at 3).

Instead, the Attorney General purported to apply judicially created default rules. Rather than interpret the statute, the Attorney General simply applied or interpreted Supreme Court case law. The Attorney General is not in a better position than this Court, however, to apply judicial default rules. Accordingly, the deference normally accorded to agency interpretation of statutes is wholly inappropriate in this case. *See Mojica*, 1997 WL 357808, at *55–57; *Vargas v. INS*, 938 F.2d 358, 363 (2d Cir.1991) (administrative agency decision not involving statutory interpretation, but instead involving post-hoc rationalizations of prior decisions, cannot command *Chevron* deference); *Akins v. Federal Election Comm'n*, 101 F.3d 731, 740 (D.C.Cir.1996) (rejecting *Chevron* deference for agency interpretation of Supreme Court ruling).

### CONCLUSION

In my February 27th opinion, I commented on the "inexplicable fervor" with which the Government seemed to be proceeding against Yesil. I rejected the Government's arguments, accepted Yesil's, and granted the petition. Rather than simply take an appeal, the Government moved for reconsideration, arguing that a statute that did not become law until April 1996 should be applied to Yesil—even though the only reason his section 212(c) application was not considered prior to the passage of the new law was that the IJ and BIA erroneously declared him ineligible in 1995. Moreover, even as it was moving for reconsideration on the basis of section 440(d), the Government announced that if its motion for reconsideration were denied and its arguments with respect to section 440(d) rejected, it could—regardless of this Court's rulings—proceed on yet another basis (section 309 of the IIRIRA) to deport Yesil.

The Government's mean-spirited relentlessness is difficult to comprehend, in view of the equities of the case.

From the Government's point of view, what is at stake is nothing more than giving Yesil a hearing, an opportunity to say "I deserve another chance," an opportunity to present evidence to an Immigration Judge who will fairly examine the circumstances and decide whether Yesil is in fact deserving of a second chance. The Government has not identified any compelling public interest that would be undermined by giving Yesil this simple chance to be heard.

On the other hand, from Yesil's point of view, much more is at stake. If he is not given an opportunity to be heard on his section 212(c) application, he will be exiled. He will be banished from what has become his country and home and he will be separated from his family and friends. He will be deported back to a country that he left some 18 years ago, when he was only 16 years old. And the efforts that he has made since he committed his crime in 1987—acknowledging his mistake, pleading guilty, cooperating with law enforcement authorities, risking his life to infiltrate a drug ring, providing leads to a number of arrests and the confiscation of drugs, establishing two legitimate businesses employing hundreds of people, and otherwise becoming a productive and positive member of society—will be swept aside, for no rational purpose and to no apparent end.

The law, the facts, and the equities all point to one result: Motion denied.

On remand, the Government is ordered to provide Yesil a hearing on his section 212(c) application and to consider the application on its merits. The Government may not use section 440(d) of the AEDPA or section 309 of the IIRIRA or any other newly-enacted provision of law to deport him, and the Government is hereby enjoined from doing so.

SO ORDERED.