# United States Court of Appeals

## For the First Circuit

---

No. 99-1429


DWIGHT W. MATTIS,

Petitioner, Appellant,

v.

JANET RENO, ATTORNEY GENERAL
OF THE UNITED STATES, ET AL.,

Respondents, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

---

Before

Boudin, Stahl, and Lynch,
Circuit Judges.

---

Christopher J. Meade, American Civil Liberties Union, with whom Allan M. Tow was on brief, for petitioner, appellant.
Lyle D. Jentzer, Attorney, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, with whom David W. Ogden, Acting Assistant Attorney General, Civil Division, and Norah A. Schwarz,

Senior Litigation Counsel, Office of Immigration Litigation, were on brief, for respondents, appellees.

————————————

May 8, 2000

————————————

**LYNCH, Circuit Judge**. Before April 1996, lawful permanent resident aliens who were deportable because they had committed certain criminal offenses had one last hope to remain in the United States. They could apply for a waiver of deportation, technically known as a § 212(c) waiver, and the Attorney General, by act of grace, could grant relief.[1] The act of grace was not rare: in the years immediately preceding the statute's passage, over half the applications were granted. See Mojica v. Reno, 970 F. Supp. 130, 178 (E.D.N.Y. 1997); cf. Wallace v. Reno, 24 F. Supp. 2d 104, 110 (D. Mass. 1998).

Congress changed this in April of 1996 when it passed AEDPA, the Antiterrorism and Effective Death Penalty Act of 1996, Pub. Law No. 104-132, 110 Stat. 1214. In AEDPA § 440(d), Congress eliminated § 212(c) relief for a significant number of criminal aliens. In September of 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. Law No. 104-208, 110 Stat. 3009-546. IIRIRA eliminated § 212(c) relief altogether and

---

[1] Prior to 1996, § 212(c) relief was available for an alien who was deportable because of an aggravated felony conviction as long as the alien had served less than five years in prison for the conviction. See Immigration and Naturalization Act (INA) § 212(c), 8 U.S.C. § 1182(c) (1994). The only other requirement for relief under § 212(c) prior to AEDPA was that the alien have maintained "lawful unrelinquished domicile of seven consecutive years" in the United States. See id.

replaced it with a new form of relief, "cancellation of removal." See 8 U.S.C. § 1229b. Compared with pre-AEDPA § 212(c) relief, this new form of relief applies to a much smaller group of aliens who have committed crimes. Compare id. § 1229b(a), with INA § 212(c), 8 U.S.C. § 1182(c) (1994).

Some deportable aliens, as a result, have been caught in the transition between the different legal schemes established by these statutory changes. Thus, a series of questions has arisen as to which aliens are subject to which rules. Congress was not explicit in this regard, and so it has fallen to the courts to try to best determine what Congress intended and, failing that, which judicial default rules should apply.

This case is the third in a trilogy of cases that has dealt with those types of questions. The first question was whether § 212(c) relief had been eliminated for deportable aliens who had applications for such relief pending when AEDPA became effective. We answered that question "no" in Goncalves v. Reno, 144 F.3d 110, 133 (1st Cir. 1998), cert. denied, 526 U.S. 1004 (1999). The second question was whether such relief was nonetheless eliminated as to aliens who had not applied for § 212(c) relief prior to AEDPA's effective date but against whom deportation proceedings had begun as of that date. We answered that question "no" in Wallace v. Reno, 194 F.3d 279, 285 (1st Cir. 1999).

This case presents a third question, one which we expressly reserved in Wallace: whether § 212(c) relief was eliminated for aliens whose convictions predated AEDPA's passage but who were not placed into deportation proceedings until after AEDPA's passage. See id. at 287. We answer "yes, except." The "except" is for cases where the deportable alien has demonstrated to the INS that, prior to AEDPA's passage, he or she actually relied on the availability of § 212(c) relief in entering a guilty plea or not contesting a criminal charge. For the reasons stated herein, we affirm the dismissal of the habeas petition and vacate the stay of deportation.[2]

**I**

Dwight W. Mattis is a native and citizen of Jamaica. In February 1989, at the age of sixteen, he entered the United States as a lawful permanent resident and has been here since. He is married to a U.S. citizen and he has a child. The rest of his family is in this country. For several years, he ran two beauty salons in Springfield, Massachusetts, that had several employees. He lives within walking distance of his parents' home and has occasionally given them financial support.

---

[2]      Mattis presents another claim: that AEDPA § 404(d) violates the Equal Protection Clause because it bars § 212(c) relief for deportable aliens but not for excludable aliens. This court has previously rejected that argument, see Almon v. Reno, 192 F.3d 28, 32 (1st Cir. 1999), and we do not revisit the issue here.

On January 22, 1997, the INS issued an Order to Show Cause against Mattis, charging him with deportability as an alien convicted of a controlled substance violation under former INA § 241(a)(2)(B)(i), 8 U.S.C. § 1251(a)(2)(B)(i) (1994), and as an alien convicted of an aggravated felony under former INA § 241(a)(2)(A)(iii), 8 U.S.C. § 1251(a)(2)(A)(iii) (1994).[3] The charges were based upon convictions for five different offenses: (1) a 1991 conviction for possession of cocaine; (2) a 1992 conviction for possession of cocaine; (3) a 1994 conviction for possession of marijuana; (4) a 1995 conviction for trafficking in cocaine; and (5) a 1995 conviction for statutory rape.[4] At his deportation hearing, Mattis admitted the INS's allegations and made no objection to the INS's entry into evidence of certified copies of the convictions. Mattis sought relief in the form of a discretionary waiver of deportation under INA § 212(c).

After the hearing, the IJ ruled that the INS had proven, by clear and convincing evidence, that Mattis was deportable. Specifically, the IJ found that the INS had established deportability on two grounds: (1) Mattis's conviction of a controlled substance offense under former INA § 241(a)(2)(B)(i), and (2) his convictions of

_____

[3] INA §§ 241(a)(2)(B)(i) and (a)(2)(A)(iii) have been transferred to INA §§ 237(a)(2)(B)(i) and (a)(2)(A)(iii), 8 U.S.C. §§ 1227(a)(2)(B)(i) and (a)(2)(A)(iii). See IIRIRA § 305(a)(2).

[4] Except for Mattis's 1991 conviction for possession of cocaine, the convictions were all obtained through guilty pleas.

-6-

aggravated felonies under former INA § 241(a)(2)(A)(iii), pursuant to three separate statutory definitions of "aggravated felony." Mattis's aggravated felonies included (1) trafficking in cocaine, which is an aggravated felony under INA § 101(a)(43)(B), 8 U.S.C. § 1101(a)(43)(B); (2) statutory rape, which is an aggravated felony under INA § 101(a)(43)(A), 8 U.S.C. § 1101(a)(43)(A); and (3) statutory rape, which is also an aggravated felony under INA § 101(a)(43)(F), 8 U.S.C. § 1101(a)(43)(F). Applying AEDPA § 440(d), the IJ denied Mattis's application for § 212(c) relief because he was deportable by reason of having been convicted of an aggravated felony. The BIA upheld this decision.[5]

The "aggravated felony" point has some importance. IIRIRA expanded the definition of "aggravated felony." See IIRIRA § 321. Under former INA § 101(a)(43), 8 U.S.C. § 1101(a)(43) (1994), only

---

[5] The denial of the application for § 212(c) relief by the IJ and BIA was based on the Attorney General's position in Matter of Soriano, Int. Dec. 3289, 1996 WL 426888 (Op. Att'y Gen. Feb. 21, 1997). Soriano held that AEDPA § 440(d)'s elimination of § 212 relief for certain aliens applied immediately as of April 24, 1996, to all cases, including those with § 212(c) applications pending. See id. We disagreed with Soriano in Goncalves, 144 F.3d at 133.

To the best of our knowledge, the Attorney General has not issued a new interpretation on the question of AEDPA § 440(d)'s reach in light of Goncalves and Wallace or the opinions of the majority of the circuits that have reached the same outcomes as those two cases.

Thus, on the precise question before us, all we have is the litigating position of the government as expressed in its brief, which is not entitled to much deference. See Massachusetts v. Blackstone Valley Elec. Co., 67 F.3d 981, 991 (1st Cir. 1995).

Mattis's cocaine trafficking conviction would have constituted an aggravated felony conviction. The expanded definition of "aggravated felony," which renders Mattis's statutory rape conviction an aggravated felony on two grounds, applies to Mattis, since "action" was taken on his case after IIRIRA's passage. See IIRIRA § 321(c); Choeum v. INS, 129 F.3d 29, 36-37 (1st Cir. 1997).

Mattis filed a petition for habeas corpus in the district court pursuant to 28 U.S.C. § 2241, seeking review of the BIA's decision.[6] Mattis argued there, as he does here, that applying AEDPA § 440(d) to preclude him from eligibility for a § 212(c) waiver of deportation constitutes an impermissible retroactive application of the section because his guilty pleas pre-dated AEDPA's passage. The district court dismissed his petition, finding that applying AEDPA § 440(d) to Mattis would not have a retroactive effect. See Mattis v. Reno, 44 F. Supp. 2d 379, 383-84 (D. Mass. 1999). The district court reasoned that because the INS had not instituted deportation proceedings against Mattis until nine months after he pled guilty to the 1995 charges, Mattis could not have had a reliance interest in

_____

[6] The government acknowledges that this court's decision in Wallace, 194 F.3d at 285, makes clear that habeas relief remains available in the district courts to aliens such as Mattis.

the availability of § 212(c) relief when he pled guilty.  See id. at 384.  Mattis then filed this appeal.

The petition involves a pure issue of law and review is de novo.  See Goncalves, 144 F.3d at 116.

**II**

A.  Statutory Provisions

AEDPA § 440(d) narrowed the availability of § 212(c) relief by rendering ineligible (for withholding of deportation) any alien deportable because of, inter alia, an aggravated felony conviction, regardless of the amount of time served.[7]  See AEDPA § 440(d) (removing availability of § 212(c) relief for aliens who are "deportable by reason of having committed any criminal offense" covered in, inter alia, INA § 241(a)(2)(A)(iii) (aggravated felons)).  Section 440(d), unlike some other sections of AEDPA, has no specified temporal reach. See Wallace, 194 F.3d at 286 (stating that certain sections of

---

[7]     AEDPA § 440(d) also renders ineligible for § 212(c) relief aliens, such as Mattis, who are deportable because of drug convictions. See AEDPA § 440(d) (removing availability of § 212(c) relief for aliens who are "deportable by reason of having committed any criminal offense" covered in, inter alia, § 241(a)(2)(B) (controlled substance offenses)).  The IJ did not rely on this ground for ineligibility in pretermitting Mattis's application and so it is not before us.

AEDPA are expressly retroactive and others expressly prospective, while § 440(d) contains no such express provisions).

Absent § 440(d), Mattis would have been eligible for consideration for § 212(c) relief at his deportation hearing. By the time the Show Cause Order issued, Mattis had apparently maintained seven consecutive years of residency in the United States,[8] and he had served less than five years in prison for his aggravated felony convictions. There is also no question that Mattis would be ineligible for § 212(c) relief if AEDPA § 440(d) applies to him.[9]

---

[8]    There is no evidence in the record as to whether Mattis in fact maintained continuous lawful residency in the United States, but the INS does not argue to the contrary.

[9]    Mattis makes an argument based on the equities that had the INS prosecuted his case in a more timely fashion, he would likely have remained eligible, under Wallace, to apply for § 212(c) relief. It is worth noting that, had the INS waited until April 1, 1997 (three more months) to prosecute Mattis's case -- a decision that would not be reviewable in any court, see INA § 242(g), 8 U.S.C. § 1252(g); Reno v. American-Arab Anti-Discrimination Comm., 525 U.S. 471, 482 (1999) -- Mattis would not have been able to apply for a waiver, as his case would have been governed by the permanent provisions of IIRIRA, see Prado v. Reno, 198 F.3d 286, 288 n.2 (1st Cir. 1999), and INA § 240A, the relevant permanent provision enacted by IIRIRA, does not allow for waivers for aggravated felons.

B. Retroactivity Analysis

The "presumption against retroactive legislation is deeply rooted in our jurisprudence," and the "principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal." Landgraf v. USI Film Products, 511 U.S. 244, 265 (1994) (internal quotation marks and citation omitted). Accordingly, absent Congress's clear intent to the contrary, we presume that a law will not apply retroactively to conduct that occurred prior to the law's enactment. See Hughes Aircraft Co. v. United States, 520 U.S. 939, 946 (1997). Thus, we first attempt to discern congressional intent. If that intent is not clear, a second-level inquiry must be made to ascertain whether applying the law to the conduct at issue would have a "retroactive effect," id., as a law does not operate retroactively "merely because it is applied in a case arising from conduct antedating [its] enactment," Landgraf 511 U.S. at 269. This second inquiry "demands a common sense, functional judgment about 'whether the new provision attaches new legal consequences to events completed before its enactment.'" Martin

v. <u>Hadix</u>, 119 S. Ct. 1998, 2006 (1999) (quoting <u>Landgraf</u>, 511 U.S. at 270).

1. <u>Congressional Intent</u>

Congress's intent with regard to the proper scope of § 440(d) is not clear.  In <u>Goncalves</u>, we were faced with the question of whether the section should apply to an alien who not only was in deportation proceedings at the time of AEDPA's passage, but also had already applied for relief under § 212(c) prior to

AEDPA's passage.  <u>See</u> <u>Goncalves</u>, 144 F.3d at 133.  We examined the statutory language and legislative history of § 440(d) and other relevant sections, and, employing these "traditional tools of statutory construction," <u>id.</u> at 127 (internal quotation marks and citations omitted), we concluded that Congress most likely did not intend § 440(d) to remove eligibility for § 212(c) relief from those whose applications were pending on the effective date of AEDPA.  <u>See</u> <u>id.</u> at 133.  Most other circuits agreed with the outcome, for this and other reasons.  <u>See</u> <u>Magana-Pizano</u> v. <u>INS</u>, 200 F.3d 603, 611 (9th Cir. 1999); <u>Pak</u> v. <u>Reno</u>, 196 F.3d 666, 675-76 (6th Cir. 1999); <u>Shah</u> v. <u>Reno</u>, 184 F.3d 719, 724 (8th Cir. 1999); <u>Mayers</u> v. <u>United States Dep't of</u>

-12-

INS, 175 F.3d 1289, 1304 (11th Cir. 1999); Sandoval v. INS, 166 F.3d 225, 242 (3d Cir. 1999); Henderson v. INS, 157 F.3d 106, 130 (2d Cir. 1998); cf. Tasios v. Reno, 204 F.3d 544, 552 (4th Cir. 2000).

In Wallace, the question was whether § 440(d) should apply to aliens who were in deportation proceedings prior to AEDPA's passage but who had not yet applied for § 212(c) relief. As to that situation, we concluded that we could not discern a clear expression of congressional intent and applied judicial default rules. See Wallace, 194 F.3d at 286-87.

Now, we are faced with a situation two steps removed from the situation in Goncalves and one step removed from the situation in Wallace. Nothing in the language of AEDPA or its history renders us any more able to discern congressional intent as to the present question than we were able to in Wallace. The circuits that have faced the exact question before us have also found that Congress's intent with regard to § 440(d)'s reach is ambiguous. See, e.g., Tasios, 204 F.3d at 548-49; Magana-Pizano, 200 F.3d at 612; Jurado-Gutierrez v. Greene, 190 F.3d 1135, 1150 (10th Cir. 1999); DeSousa v. Reno, 190 F.3d 175, 186-87 (3d Cir. 1999).

-13-

## 2. Retroactive Effect

That ambiguity forces us to decide whether applying § 440(d) to Mattis would have a retroactive effect. Using the Supreme Court's terminology, we must determine if applying the section to Mattis would deprive him of "legitimate expectations and upset settled transactions." General Motors Corp. v. Romein, 503 U.S. 181, 191 (1992). We examine "the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event." Landgraf, 511 U.S. at 270.

The INS argues that applying § 440(d) to Mattis would not have a retroactive effect because Mattis could not possibly have committed the underlying criminal offenses in reliance on the availability of discretionary relief.[10] With deference, we think that

---

[10] In inquiring into retroactive effect in cases identical to this one, some courts have viewed the alien's underlying criminal act as a "relevant past event." See, e.g., Jurado-Gutierrez, 190 F.3d at 1151 ("Petitioners had no settled expectations of discretionary relief when they committed their crimes."); Requena-Rodriquez v. Pasquarell, 190 F.3d 299, 308 (5th Cir. 1999) (noting that "[the alien] could not seriously suggest that he would have refrained from [committing the criminal act] . . . had he only known that . . . he would not be eligible [for a waiver of deportation]"); DeSousa, 190 F.3d at 187 ("The consequences of petitioner's criminal conduct were clear at the time of that conduct and they remain unchanged today." (internal quotation marks and citation omitted)); Turkhan v. Perryman, 188 F.3d 814, 828 (7th Cir.

-14-

is the wrong focus for several reasons.  First, it is the conviction, not the underlying criminal act, that triggers the disqualification from § 212(c) relief.  Second, the focus on the underlying primary conduct is too narrow.  In Hughes Aircraft, the Supreme Court did not focus solely on whether the statutory amendment to the False Claims Act that partially removed a bar to private suits made it more or less likely the company would engage in a violation of the Act.  Rather, in addition to examining the new law's impact on the filing of false claims, see Hughes Aircraft, 520 U.S. at 947-48, the Court also focused on the consequence to a company once a False Claims Act claim was brought, see id. at 948.  That consequence was to "eliminate[] a defense to a qui tam suit . . . and therefore change[] the substance of the existing cause of action for qui tam defendants."  Id.  More closely on point, our opinion in Wallace viewed an alien's decisions and actions during his deportation proceedings, and not his underlying criminal act, as the "relevant past event" for purposes of the retroactivity analysis.  We explained in Wallace that, by the time an alien has been placed in deportation proceedings, "the waiver rules .

1999) (stating that "[i]t would border on the absurd to argue that these aliens might have decided not to commit drug crimes . . . had they known . . . they could not ask for a discretionary waiver of deportation" (internal quotation marks and citation omitted)).  We agree with all of those statements as to the aliens' interests at the time they committed the crimes, but we do not find them dispositive.

-15-

. . become a common focus of expectation and even reliance." See Wallace, 194 F.3d at 287. Further, "an alien's choice of strategy in [the deportation] proceeding may well be affected by the chances of waiver." Id.

Because Mattis had not yet been placed into deportation proceedings when AEDPA became law, our reasoning in Wallace does not dispose of this case. Mattis's reliance and expectation interests are not nearly as strong as the interests presented by the petitioners in Goncalves and Wallace. In the present case, unlike in Goncalves, there was no summary dismissal of a pending § 212(c) petition that was entirely authorized at the time it was filed. And, unlike the situation in Wallace, there was no changing of the rules once a deportation proceeding had been started. Mattis's only reliance and expectancy interests were those he had at the time he pled guilty, knowing that he could be deported as a consequence.

Here, as in Wallace, it has fallen to the courts to draw a line, applying judicial default rules.[11] The line in this case could be drawn in various places. The three most evident are:

> 1. that § 212(c) relief is eliminated for all deportable aliens with the requisite criminal convictions, where deportation proceedings commenced after the passage of AEDPA -- the position urged by the government;

---

[11]     Of course, when Congress does not specify where to draw the lines, we assume that it makes this choice against a background of judicial decisions that have established default rules.

2. that § 212(c) relief is unaffected by AEDPA § 440(d) for all deportable aliens in such circumstances -- the position urged by Mattis; or

3. that § 212(c) relief continues to be available for deportable aliens whose requisite criminal convictions pre-dated AEDPA, if, and only if, the alien actually and reasonably relied on the availability of § 212(c) relief when he pled guilty to or did not contest the criminal charges.

We adopt the third rule, which we believe best fits with the approach the Supreme Court has taken to issues of retroactivity.

Retroactivity analysis arises in different contexts that pose different questions, and the tests articulated by the Supreme Court cannot be applied mechanically. Prior decisions are not on point. The question here is not whether a new statute restricting relief applies to pending proceedings for that relief. That was the question in Lindh v. Murphy, 521 U.S. 320, 322-23 (1997), and in Goncalves. The question here is not whether a new statute restricting relief applies to pending proceedings even though an application for the specific relief had not been made prior to the statute's enactment. That was the situation in Wallace. The question here is not whether a new statute eliminating a defense to a cause of action applies in pending suits where the conduct that gave rise to the suit pre-dated the new statute. That was the situation in Hughes Aircraft. The question here is not whether a new statute eliminating attorney's fees for work performed applies (a) to work that was done before the enactment of the statute and for which

-17-

there was a reasonable expectation of payment or (b) to work that was done after the statute's enactment but in cases pending at the time of the statute's enactment. That was the situation in Hadix. In each of these different situations, the familiar two-step retroactivity analysis was undertaken. And in each of these cases, the second step of the analysis -- applying judicial default rules -- weighed considerations of potential unfairness (including both fair notice and reliance) against the intended purposes and benefits of the statute. We apply the same calculus here.

The general thrust of IIRIRA and AEDPA is clear. As the district court noted, it is difficult to believe that Congress, despite having narrowed the eligibility for § 212(c) relief, wanted such relief to remain available for years to come in all deportation proceedings begun after April 1996 simply because the alien was convicted before April 1996. Cf. Barreiro v. INS, 989 F.2d 62, 64 (1st Cir. 1993). Congress's clear intent in passing AEDPA and IIRIRA was to facilitate the deportation of criminal aliens by broadening the class of crimes that render an alien deportable and by narrowing the class of deportable criminal aliens eligible for discretionary relief.[12] With

---

[12] In addition to narrowing eligibility for § 212(c) relief by enacting AEDPA § 440(d), Congress, in AEDPA § 435, expanded the range of criminal convictions that render an alien deportable. Compare 8 U.S.C. § 1251(a)(2)(A)(i)(II) (1994), with 8 U.S.C. § 1227(a)(2)(A)(i)(II). In IIRIRA § 309, Congress eliminated § 212(c)

-18-

regard to waivers for aggravated felons, the permanent provision of IIRIRA that replaced § 212(c) continues to exclude aggravated felons from eligibility.  See supra note 9.

It is one thing not to apply AEDPA § 440(d) to pending § 212(c) applications or to pending deportation proceedings; it is another not to apply it to deportation proceedings begun after AEDPA's effective date.  That is particularly so in light of both the widespread understanding that § 212(c) relief is an act of grace and the fact that Congress has restricted judicial review of denials of the relief.  See Kolster v. INS, 101 F.3d 785, 788-90 (1st Cir. 1996).

There are, however, arguments and interests on the other side.  If Congress had wanted the elimination of § 212(c) relief to apply here, it could easily have said so.  Also, as Mattis argues, the group affected by his proposed rule is finite (we are dubious about his argument that the group is small, but there is no record evidence on this point), as aliens whose deportation proceedings commenced after April 1, 1997, are governed by IIRIRA's new, permanent rule.  See supra

---

relief altogether and replaced it with § 240A relief, see supra note 9, and, consistent with AEDPA § 440(d), excluded aggravated felons from eligibility, see 8 U.S.C. § 1229b(a)(3).  Congress also restricted eligibility for § 240A relief by enacting a provision that stops the clock on an alien's continuous residency period as of the date of the criminal offense or the show cause order, whichever comes first.  See 8 U.S.C. § 1229b(d)(1).  Finally, in IIRIRA § 321, Congress expanded the definition of "aggravated felony," thus broadening the range of deportable aliens and narrowing the class of deportable aliens eligible for either § 212(c) relief or § 240A relief.

-19-

note 9. Moreover, factors of administrative ease and clarity are well served by the Wallace rule and would not be much hindered by extending Wallace to adopt Mattis's position.

Most importantly, there may be some reliance and expectation interests involved. Of course, any such reliance must be reasonable. Mattis correctly notes that prior to AEDPA, a guilty plea to an aggravated felony rendered one deportable, but did not necessarily result in deportation because of the availability of a waiver. As a result, it can be argued that § 440(d) attaches new legal consequences to Mattis's guilty plea. At oral argument, Mattis's counsel suggested to the court that we recognize a general reliance interest in § 212(c) relief that existed at the plea bargaining stage prior to AEDPA. It is true that a significant number of aliens deportable because of criminal convictions were granted waivers in the years preceding AEDPA. See Mojica, 970 F. Supp. at 178; cf. Wallace, 24 F. Supp. 2d at 110. Further, "[t]hat an alien charged with a crime [that would render him deportable] would factor the immigration consequences of conviction in deciding whether to plead or proceed to trial is well-documented." Magana-Pizano, 200 F.3d at 612.

Although deportation legislation is not subject to Ex Post Facto Clause constraints, cases analyzed under the clause can inform the retroactive effect analysis, see Hughes Aircraft, 520 U.S. at 948. Under that clause, a change from a system of discretionary relief to one of mandated outcomes operates retroactively when applied to prior conduct. See Lindsey v. Washington, 301 U.S. 397, 401 (1937). The same might be said of removing a form of discretionary relief. It is not inconceivable that some aliens pled guilty to crimes or did not contest criminal charges before April 1996 in reasonable reliance on the availability of § 212(c) waivers. This universe of aliens is, of course, much smaller than the universe of all aliens whose guilty pleas were entered before April 1996, the universe Mattis seeks to encompass.

The universe of all aliens who entered guilty pleas before April 1996 is too broad, as there are many reasons to plead guilty, reasons much stronger than the hope of discretionary relief from deportation: hopes of sentencing leniency in recognition of acceptance of responsibility, a better bargain from the government in exchange for not going to trial, and the like. Nonetheless, there is reason to believe that there might be some aliens who made such choices in actual and reasonable reliance on the availability of § 212(c) relief. Good defense counsel in criminal cases often advise clients about immigration law consequences. There may well be those who pled despite having a colorable defense because the act of accepting responsibility

-21-

would bode well for their § 212(c) application. Similarly, there may be aliens who pled to lesser offenses than those charged in order to ensure that they would serve less than five years of prison time. If applied to such aliens, that is, those who pled to or did not contest criminal charges in reasonable reliance on the availability of § 212(c) relief, AEDPA § 440(d) would have a retroactive effect. The questions of whether there was actual reliance and whether it was reasonable are questions of fact to be resolved by the IJ.

In addition, our own prior case law lends support to the rule we adopt. In Kolster we recognized the possibility that an alien's guilty plea could have been induced by reasonable reliance on discretionary § 212(c) relief, but found that the petitioner there had not and could not show such reliance. See Kolster, 101 F.3d at 789 (noting that the court "[had] no reason to think [the alien's guilty plea] was induced by reliance on discretionary relief under section 212(c)" when the alien was three years away from being eligible for § 212(c) relief at the time he pled guilty). We declined to adopt a rule presuming such reliance in all situations. See id. Kolster addressed a question about restrictions on judicial review and expressly noted a Seventh Circuit decision reaching a different outcome where the petitioner had conceded deportability in

reliance on the availability of judicial review of the denial of §
212(c) relief. See id. (acknowledging Reyes-Hernandez v. INS, 89 F.3d
490, 492 (7th Cir. 1996)).  The rule we adopt today is also, we think,
most in accord with our approach in Goncalves and Wallace.

Our position adopts a middle ground among the circuits.  The
Ninth Circuit reached a similar conclusion to ours in Magana-Pizano,
200 F.3d. at 612-13.  The Seventh Circuit has at least suggested that
a showing of actual reliance at the plea bargain stage might alter the
retroactivity analysis.  See Turkhan, 188 F.3d at 827 (noting, in a
case involving a pending § 212(c) application, that the court did not
"believe that Turkhan's guilty plea to the underlying drug offense was
induced by any reliance on discretionary relief under INA § 212(c).").

We acknowledge that the Third and Tenth Circuits have adopted
the first rule -- the rule the government urges.  See DeSousa, 190 F.3d
at 187; Jurado-Gutierrez, 190 F.3d at 1150.  And, the Fifth Circuit
appears to have adopted this rule as well, see Requena-Rodriguez v.
Pasquarell, 190 F.3d 299, 307-08 (5th Cir. 1999) (finding no
retroactive effect in applying § 440(d) to pending proceedings),
although it is unclear whether the court might permit a showing of
actual reliance, see id. at 308 (noting that the alien "could not
seriously suggest that he would have . . . changed his plea" had he
known he would be ineligible for a waiver).

The Fourth Circuit has taken an entirely different approach, adopting a blanket rule that applying AEDPA § 440(d) to all guilty pleas made before AEDPA's enactment would have an impermissible retroactive effect. See Tasios, 204 F.3d at 552. [13]

C. Application of the Rule and Evidence of Reliance

It remains to apply this rule to this case. Mattis argues that we should remand this matter to the agency so that he might have an opportunity to prove his reliance on the availability of § 212(c) relief. We disagree. This opinion sets forth a new rule, and we might ordinarily remand as a result. But we see no injustice to Mattis in not remanding, for two reasons.

First, Mattis has waived this claim, as he did not raise it before the BIA or the district court. Traditional rules regarding exhaustion and waiver govern on direct review of BIA final orders. See, e.g., Prado v. Reno, 198 F.3d 286, 292 (1st Cir. 1999). We see no reason why the same should not hold on habeas review, which we have suggested is less broad than direct review. See Goncalves, 144 F.3d at 125. Failure to raise a claim on direct review of a criminal conviction constitutes a procedural default (absent a showing of cause and prejudice), barring the claim from being raised on habeas. See

---

[13] In Tasios, the Fourth Circuit also identified the potential unfairness of applying § 440(d) to aliens who had conceded deportability before AEDPA's enactment. See 204 F.3d at 552. Given our holding in Wallace, that problem should not arise in this circuit.

-24-

Prou v. United States, 199 F.3d 37, 47 (1st Cir. 1999). And failure to raise a claim before the district court on a petition for habeas corpus bars a petitioner from raising that claim before the reviewing court of appeals. See Watkins v. Ponte, 987 F.2d 27, 31 (1st Cir. 1993); cf. Nakaranurack v. United States, 68 F.3d 290, 293 (9th Cir. 1995) (applying procedural default rule to alien seeking habeas corpus relief from final order of deportation). Mattis had the opportunity to raise the argument, and there was no reason to think he could not. Although our opinion sets forth a new rule, the issue of reliance is hardly new. The issue of reliance is central to any inquiry into the retroactive effect of a new law under the Landgraf analysis and was discussed in Kolster. Both of those decisions pre-dated the habeas petition here.

In addition, there is little reason to think Mattis has a colorable claim of actual and reasonable reliance of the sort recognized by our new rule. Mattis had not yet accrued seven years of continuous residency in the United States when he entered any of his guilty pleas. His potential eligibility for § 212(c) relief, therefore, turned upon when the INS chose to institute deportation proceedings against him. Further, Mattis's deportation is based upon five separate criminal

convictions, including three aggravated felonies.  With each succeeding guilty plea to the offenses, ranging over a period of four years, any argument that the plea was in actual reliance on the availability of § 212(c) relief becomes more and more tenuous.  Any argument that each succeeding plea was entered in <u>reasonable</u> reliance on the availability of § 212(c) relief becomes untenable.

## III

We <u>affirm</u> the decision of the district court dismissing Mattis's habeas corpus petition, and we vacate the stay of deportation.

So ordered.