# HUGHES AIRCRAFT CO. *v.* UNITED STATES EX REL. SCHUMER

No. 95–1340.   Argued February 25, 1997—Decided June 16, 1997

*Kenneth W. Starr* argued the cause for petitioner. With him on the briefs were *Christopher Landau, John J. Higgins, John T. Kuelbs,* and *Daniel R. Allemeier.*

*Laurence Gold* argued the cause for respondent. With him on the brief were *David Silberman* and *Leon Dayan.*

*Deputy Solicitor General Waxman* argued the cause for the United States as *amicus curiae* urging affirmance. On the brief were *Acting Solicitor General Dellinger, Assistant Attorney General Hunger, Deputy Assistant Attorney General Preston, Malcolm L. Stewart, Michael F. Hertz, Douglas Letter,* and *Joan Hartman.**

JUSTICE THOMAS delivered the opinion of the Court.

The *qui tam* provision of the False Claims Act (FCA or Act), 31 U. S. C. § 3730(b), permits, in certain circumstances, suits by private parties on behalf of the United States against anyone submitting a false claim to the Government. Prior to 1986, such suits were barred if the information on which they were based was already in the Government's possession. At issue in this case is whether a 1986 amendment to the FCA partially removing that bar applies retroactively to *qui tam* suits regarding allegedly false claims submitted prior to its enactment and, if so, whether this particular action meets the requirements of the amended Act. We hold

---

*Briefs of *amici curiae* urging reversal were filed for the Aerospace Industries Association of America, Inc., by *Mac S. Dunaway* and *Gary E. Cross;* for the Association of American Medical Colleges et al. by *John T. Boese, Richard A. Sauber, Kirk B. Johnson, Michael L. Ile, John E. Steiner, Jr.,* and *Joseph A. Keyes, Jr.;* for the Chamber of Commerce of the United States of America et al. by *Clarence T. Kipps, Jr., Alan I. Horowitz, Peter B. Hutt II, Alvaro I. Anillo, Stephen A. Bokat, Robin S. Conrad,* and *Franklin W. Losey;* for FMC Corp. by *Allan J. Joseph, Martin Quinn,* and *David F. Innis;* for Lockheed Martin Corp. by *James J. Gallagher, Mark R. Troy, Barbara J. Bacon,* and *Lester W. Schiefelbein, Jr.;* for Northrop Grumman Corp. by *Brad D. Brian, Kristin A. Linsley,* and *Daniel P. Collins;* and for the Washington Legal Foundation by *Stuart M. Gerson, Daniel J. Popeo,* and *Paul D. Kamenar.*

Briefs of *amici curiae* urging affirmance were filed for the National Employment Lawyers Association by *James B. Helmer, Jr., Frederick M. Morgan, Jr.,* and *Julie Webster Popham;* for the National Health Law Program, Inc., by *William J. Blechman;* for the Project on Government Oversight by *Charles Tiefer;* and for Taxpayers Against Fraud, The False Claims Act Legal Center, by *Priscilla R. Budeiri.*

that the 1986 amendment does not apply to this action and therefore that this action should have been dismissed, as required by the 1982 version of the Act.

I

In December 1981, the Northrop Corporation awarded petitioner Hughes Aircraft Company a subcontract to design and develop a radar system for the B–2 bomber, which Northrop was then constructing under contract with the Air Force. Both Northrop's subcontract with Hughes and the Air Force's contract with Northrop were "cost-plus" contracts, which provided that the subcontractor and the contractor, respectively, were to be reimbursed for all costs properly incurred plus a reasonable profit. Several months after Hughes was awarded the B–2 subcontract, the McDonnell-Douglas Corporation awarded Hughes a "fixed-price" subcontract to design and develop an upgraded radar system for the F–15 fighter aircraft, which McDonnell-Douglas was then building for the Air Force. (Under the fixed-price contract, Hughes was to receive a set price, regardless of costs.) When it became apparent to Hughes that the projects overlapped in significant respects, Hughes adopted two internal "commonality agreements" allocating between its F–15 and B–2 divisions various costs that were common to the two projects.

After costs in the B–2 program escalated, Northrop requested a Government audit of Hughes' accounting practices to ascertain whether Hughes had improperly shifted costs from the fixed-price F–15 subcontract to the cost-plus B–2 subcontract. The Air Force initially concluded, in a June 1986 preliminary classified audit report, that Hughes had improperly billed the B–2 program for certain development costs that should have been charged solely to the F–15 program. Between October 1986 and September 1988, the Defense Contract Audit Agency prepared a series of unclassified audit reports similarly concluding that Hughes had

misallocated costs between the two programs, and also concluding that Hughes had not adequately disclosed the company's commonality accounting practices in a Cost Accounting Standards report it had submitted to the Government in 1984. Based on those audits, the Government directed Northrop to withhold $15.4 million in B–2 contract payments from Hughes.[1]

On January 20, 1989, respondent William J. Schumer, formerly the Division Contracts Manager for Hughes' B–2 Division, commenced this action against Hughes pursuant to 31 U. S. C. § 3730(b), the *qui tam* provision of the FCA that authorizes private individuals, "relators," to bring claims on behalf of the United States against any person who knowingly presented false or fraudulent claims to the United States in violation of § 3729. Schumer's complaint alleged that Hughes knowingly mischarged Northrop—and through it the United States—for certain radar development costs that should have been allocated to the fixed-price F–15 subcontract with McDonnell-Douglas instead of to the cost-plus B–2 subcontract with Northrop. App. 72–80. Schumer's amended complaint alleged that Hughes' accounting practices resulted in a $50 million net overcharge, and sought treble damages in the amount of $150 million. *Id.*, at 102.[2]

Hughes moved to dismiss Schumer's action, contending that the 1986 FCA amendment was not retroactive and that

---

[1] The Government ultimately reversed its preliminary determination, concluding that the commonality agreements had actually benefited the Government by charging costs to the fixed-price F–15 program that otherwise would have been borne solely by the cost-plus B–2 program. Accordingly, the Government withdrew its earlier finding of noncompliance, determined that any noncompliance with accounting disclosure requirements was immaterial, and directed that Hughes be paid the $15.4 million previously withheld on the B–2 project. App. 136–137; App. to Pet. for Cert. 68a.

[2] The Government chose not to intervene in the action, as it was entitled to do under 31 U. S. C. § 3730(b)(2), nor did it move to dismiss the action, as it was likewise entitled to do, see § 3730(c)(2)(A).

the *qui tam* provision in effect when Hughes engaged in its allegedly wrongful conduct precluded *qui tam* suits based on information already possessed by the Government. See 31 U. S. C. § 3730(b)(4) (1982 ed.). Hughes argued in the alternative that the suit was barred even under the 1986 version of the Act because it was "based upon the public disclosure of allegations . . . in a[n] . . . administrative . . . audit," within the meaning of 31 U. S. C. § 3730(e)(4)(A).[3] The District Court denied Hughes' motion.

Hughes then moved for summary judgment on the merits, contending that it had fully disclosed the basis of its cost accounting system to all of its customers and had complied with all applicable contractual and regulatory requirements relating to cost allocation. After full briefing, the District Court concluded that Hughes had allocated some costs between the F–15 and B–2 programs consistent with disclosures Hughes made to Northrop, App. to Pet. for Cert. 46a, had allocated other costs to the fixed-price F–15 contract that could have been charged to the cost-plus B–2 contract alone (thereby benefiting the Government), *id.,* at 50a, and had properly disclosed the contents of the commonality agreements to Northrop and the Air Force, *id.,* at 46a–48a, 56a. Accordingly, the District Court held that "Schumer has not shown that Hughes violated the False Claims Act." *Id.,* at 64a.

Schumer appealed from the grant of summary judgment against him, and Hughes cross-appealed from the denial of its motion to dismiss. The Ninth Circuit rejected Hughes' cross-appeal, holding that the 1986 amendment removing certain defenses to *qui tam* suits should be applied retroactively to suits based on pre-1986 conduct because the amendment involved only the "subject matter jurisdiction" of

---

[3] Hughes also raised several constitutional challenges to the *qui tam* provisions of the Act that are not presently before us. See 519 U. S. 926 (1996) (limiting grant of certiorari to the nonconstitutional questions presented by the petition).

courts to hear *qui tam* claims and did not affect the substantive liability of *qui tam* defendants. 63 F. 3d 1512, 1517 (1995). The court further determined that the action was not barred under the 1986 version of the Act because no "public disclosure" of information possessed by the Government had been made. *Id.*, at 1518. Finally, the court reversed in part and remanded for further consideration on the merits, holding that a material factual dispute existed as to whether Hughes had made misleading and incomplete disclosures about its commonality agreements, whether or not the allegedly incomplete disclosures resulted in any harm to the public fisc. *Id.*, at 1522–1525.

We granted the petition for certiorari to consider whether the 1986 amendment is applicable to pre-1986 conduct and, if so, whether the Government's release of its audits to Hughes employees constituted a public disclosure bar under the 1986 amendment and whether harm to the public fisc is an essential element of a *qui tam* action under the amended Act. 519 U. S. 926 (1996). Because we conclude that the lower courts should not have applied the 1986 amendment and therefore that this action should have been dismissed, we express no opinion as to the Ninth Circuit's "public disclosure" and "public fisc" holdings, or as to the merits of respondent's factual contentions.

## II

The allegedly false claims at issue in this case were submitted by Hughes between 1982 and 1984. At that time, the FCA required a district court to "dismiss [a *qui tam*] action . . . based on evidence or information the Government had when the action was brought." 31 U. S. C. § 3730(b)(4) (1982 ed.). The Ninth Circuit accepted, and respondent does not dispute, that because "the government was aware of [respondent's] allegations before he filed his suit, the [1982 provision] would bar his claim," were it applicable. 63 F. 3d, at 1517.

Congress amended the FCA in 1986, however, to permit *qui tam* suits based on information in the Government's possession, except where the suit was based on information that had been publicly disclosed and was not brought by an original source of the information. See 31 U. S. C. § 3730(e)(4) (A). Because the 1986 amendment became effective before this suit was commenced, respondent contends that it, rather than the 1982 *qui tam* provision, controls. We disagree.

We have frequently noted, and just recently reaffirmed, that there is a "presumption against retroactive legislation [that] is deeply rooted in our jurisprudence." *Landgraf* v. *USI Film Products*, 511 U. S. 244, 265 (1994). "The 'principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal.'" *Ibid.* (quoting *Kaiser Aluminum & Chemical Corp.* v. *Bonjorno*, 494 U. S. 827, 855 (1990) (SCALIA, J., concurring)). Accordingly, we apply this time-honored presumption unless Congress has clearly manifested its intent to the contrary. 511 U. S., at 268.

Nothing in the 1986 amendment evidences a clear intent by Congress that it be applied retroactively, and no one suggests otherwise. Thus, under the analysis the Court adopted in *Landgraf*, if the 1986 amendment has a retroactive effect, then we presume it will not apply to the conduct alleged in this case, which occurred prior to its effective date.[4]

Respondent argues that the 1986 amendment has no retroactive effect because it does not fit within Justice Story's "influential definition" of impermissibly retroactive legislation, which we quoted with approval in *Landgraf*:

---

[4] Because both the allegedly false claim submission and the disclosure to the Government of information about that submission occurred prior to the effective date of the 1986 amendments, we need not address which of these two events constitutes the relevant conduct for purposes of our retroactivity analysis.

" '[E]very statute, which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective.' " 511 U. S., at 269 (quoting *Society for Propagation of the Gospel* v. *Wheeler*, 22 F. Cas. 756, 767 (No. 13,156) (CC NH 1814) (Story, J.)).

To the extent respondent contends that *only* statutes with one of these effects are subject to our presumption against retroactivity, he simply misreads our opinion in *Landgraf.* The language upon which he relies does not purport to define the outer limit of impermissible retroactivity. Rather, our opinion in *Landgraf,* like that of Justice Story, merely described that any such effect constituted a *sufficient,* rather than a *necessary,* condition for invoking the presumption against retroactivity. Indeed, we recognized that the Court has used various formulations to describe the "functional conceptio[n] of legislative 'retroactivity,' " and made no suggestion that Justice Story's formulation was the exclusive definition of presumptively impermissible retroactive legislation. 511 U. S., at 269.

In any event, even applying Justice Story's formulation, we reject respondent's contention that the 1986 amendment lacks retroactive effect. Respondent first argues that the 1986 amendment does not " 'impose new duties with respect to transactions already completed' " because, since 1863, "the FCA has made it unlawful to knowingly submit a false claim for payment to the United States." Brief for Respondent 15 (quoting *Landgraf, supra,* at 280). The same argument was made, and rejected, in *Landgraf.* There, we noted that the provision of the Civil Rights Act of 1991 authorizing compensatory damages "does not make unlawful conduct that was lawful when it occurred," but we "[n]onetheless" held that "the new compensatory damages provision would operate 'retrospectively' if it were applied to conduct occurring

before" its effective date. 511 U. S., at 281–282; see also *Rivers* v. *Roadway Express, Inc.*, 511 U. S. 298, 303 (1994) (holding that an increase in monetary liability could not be applied retroactively even though the "normative scope of Title VII's prohibition on workplace discrimination" was not altered).

Respondent next contends that "the 1986 Amendments to the *qui tam* bar do not create a new cause of action where there was none before, change the substance of the extant cause of action, or alter a defendant's exposure for a false claim by even a single penny [and] thus d[o] not 'increase a party's liability for past conduct.'" Brief for Respondent 15 (quoting *Landgraf, supra,* at 280). See also Brief for United States as *Amicus Curiae* 13–14. Again, respondent is mistaken. While we acknowledge that the monetary liability faced by an FCA defendant is the same whether the action is brought by the Government or by a *qui tam* relator, the 1986 amendment eliminates a defense to a *qui tam* suit— prior disclosure to the Government—and therefore changes the substance of the existing cause of action for *qui tam* defendants by "'attach[ing] a new disability, in respect to transactions or considerations already past.'" *Landgraf, supra,* at 269 (quoting *Wheeler, supra,* at 767); see also Brief for United States as *Amicus Curiae* 14, n. 6 ("[P]roof that the government had the information when suit was brought was . . . a jurisdictional defense to an action brought by a qui tam relator" (internal quotation marks omitted)); cf. *Collins* v. *Youngblood,* 497 U. S. 37, 49 (1990) ("A law that abolishes an affirmative defense" violates the *Ex Post Facto* Clause); *Beazell* v. *Ohio,* 269 U. S. 167, 169–170 (1925) ("[A]ny statute . . . which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto*").

Nor is it the case that the 1986 amendment does not "create a new cause of action." As respondent himself recognizes, "as a result of the 1986 Amendments, the federal

courts are open to an FCA action brought by a private relator on behalf of the United States," whereas "[p]rior to 1986, once the United States learned of a false claim, only the Government could assert its rights under the FCA against the false claimant." Brief for Respondent 16; see also Brief for United States as *Amicus Curiae* 14 (recognizing that the 1986 amendment "expanded the circumstances under which *qui tam* relators may pursue actions to enforce" a false claimant's liability to the Government).

The extension of an FCA cause of action to private parties in circumstances where the action was previously foreclosed is not insignificant. As a class of plaintiffs, *qui tam* relators are different in kind than the Government. They are motivated primarily by prospects of monetary reward rather than the public good. As we have previously recognized:

> " '[*Qui tam* statutes are] passed upon the theory, based on experience as old as modern civilization, that one of the least expensive and most effective means of preventing frauds on the Treasury is to make the perpetrators of them liable to actions by private persons acting, if you please, under the strong stimulus of personal ill will or the hope of gain. Prosecutions conducted by such means compare with the ordinary methods as the enterprising privateer does to the slow-going public vessel.' "
> *United States ex rel. Marcus* v. *Hess,* 317 U. S. 537, 541, n. 5 (1943) (quoting *United States* v. *Griswold,* 24 F. 361, 366 (Ore. 1885)).

*Qui tam* relators are thus less likely than is the Government to forgo an action arguably based on a mere technical noncompliance with reporting requirements that involved no harm to the public fisc.[5]

---

[5] That a *qui tam* suit is brought by a private party "on behalf of the United States," see Brief for Respondent 17, does not alter the fact that a relator's interests and the Government's do not necessarily coincide. Moreover, as the statute specifies, *qui tam* actions are brought both

950

In permitting actions by an expanded universe of plaintiffs with different incentives, the 1986 amendment essentially creates a new cause of action, not just an increased likelihood that an existing cause of action will be pursued. See, *e. g., Winfree* v. *Northern Pacific R. Co.*, 227 U. S. 296, 302 (1913). Prior to the 1986 amendment, respondent's *qui tam* action was completely barred because of Hughes' disclosure to the Government of information about its claim submissions. The 1986 amendment would revive that action, subjecting Hughes to previously foreclosed *qui tam* litigation, much like extending a statute of limitations after the pre-existing period of limitations has expired impermissibly revives a moribund cause of action, see, *e. g., Chenault* v. *U. S. Postal Service*, 37 F. 3d 535, 537, 539 (CA9 1994) (relying on *Landgraf* in concluding that "a newly enacted statute that lengthens the applicable statute of limitations may not be applied retroactively to revive a plaintiff's claim that was otherwise barred under the old statutory scheme because to do so would alter the substantive rights of a party and increase a party's liability" (internal quotation marks omitted)). This is true even if a cause of action remained open to some other party. It is simply not the case that, as respondent asserts, the elimination of a prior defense to *qui tam* actions does not "create a new cause of action" or "change the substance of the extant cause of action."

Finally, respondent contends that the 1986 amendment is jurisdictional, and hence that it is an exception to the general *Landgraf* presumption against retroactivity. Indeed, the Ninth Circuit went further, holding that, absent a clear statement of congressional intent, there is a strong presumption *in favor of* retroactivity for jurisdictional statutes. 63 F. 3d, at 1517. The Ninth Circuit simply misread our decision in *Landgraf*, for the only "presumption" mentioned in that opinion is a general presumption *against* retroactivity.

---

"*for the person* and for the United States Government." 31 U. S. C. § 3730(b)(1) (emphasis added).

The fact that courts often apply newly enacted jurisdiction-allocating statutes to pending cases merely evidences certain limited circumstances failing to meet the conditions for our generally applicable presumption against retroactivity, not an exception to the rule itself, as the United States recognizes. See Brief for United States as *Amicus Curiae* 15, and n. 8. As we stated in *Landgraf:*

> "Application of a new jurisdictional rule usually 'takes away no substantive right but simply *changes* the tribunal that is to hear the case.' Present law normally governs in such situations because jurisdictional statutes 'speak to the power of the court rather than to the rights or obligations of the parties.'" 511 U. S., at 274 (emphasis added; citations omitted).

Statutes merely addressing *which* court shall have jurisdiction to entertain a particular cause of action can fairly be said merely to regulate the secondary conduct of litigation and not the underlying primary conduct of the parties. Cf. *id.*, at 275; *id.*, at 291 (SCALIA, J., concurring). Such statutes affect only *where* a suit may be brought, not *whether* it may be brought at all. The 1986 amendment, however, does not merely allocate jurisdiction among forums. Rather, it *creates* jurisdiction where none previously existed; it thus speaks not just to the power of a particular court but to the substantive rights of the parties as well. Such a statute, even though phrased in "jurisdictional" terms, is as much subject to our presumption against retroactivity as any other.

### III

In sum, whether we consider the relevant conduct to be Hughes' disclosure to the Government or its submission of the allegedly false claim, disclosure of information about the claim to the Government constituted a full defense to a *qui tam* action prior to 1986. If applied in this case, the legal effect of the 1986 amendment would be to deprive Hughes of

that defense. Given the absence of a clear statutory expression of congressional intent to apply the 1986 amendment to conduct completed before its enactment, we apply our presumption against retroactivity and hold that, under the relevant 1982 version of the FCA, the District Court was obliged to dismiss this action because it was "based on evidence or information the Government had when the action was brought." 31 U. S. C. § 3730(b)(4) (1982 ed.). We therefore vacate the judgment below, and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*