**UNITED STATES of America,**
**Plaintiff,**

v.

**UNITED TECHNOLOGIES**
**CORPORATION,**
**Defendant.**

No. C–3–99–093.

United States District Court,
S.D. Ohio,
Western Division.

April 3, 2003.

Pamela M. Stanek, Dale Ann Goldberg, U.S. Attorney's Office, Dayton, OH, David Sadoff, U.S. Dept. of Justice, Civ. Div., Washington, DC, Michael F. Hertz, Stephen D. Altman, Dept. of Justice, Civ. Div., Commercial Lit. Branch, Washington, DC, for plaintiff.

James H. Greer, David Carr Greer, Bieser, Greer & Landis, Dayton, OH, Peter B. Work, David Z. Bodenheimer, Brian C. Elmer, Richard L. Beizer, Crowell & Moring, Washington, DC, for defendant.

**ENTRY AND ORDER DENYING DEFENDANT UNITED TECHNOLOGIES CORPORATION'S MOTION IN LIMINE TO EXCLUDE EVIDENCE OF "DELIBERATE IGNORANCE" AND "RECKLESS DISREGARD." (DOC. 100).**

ROSE, District Judge.

This matter is before the Court for decision on Defendant United Technologies

Corporation's Motion *in Limine* to Exclude Evidence of "Deliberate Ignorance" and "Reckless Disregard." Doc. 100. United Technologies seeks a ruling that a 1986 amendment to the False Claims Act, codified at 31 U.S.C. § 3729 and which lowered the state of mind necessary to sustain a finding of liability, does not apply to the Government's claims in the instant case. United Technologies bases its motion on the theory that application of the amended statute would be contrary to the cannon of statutory interpretation that cautions against retroactive application of legislative enactments. Because the United States seeks to impose liability against United Technologies on the basis of claims for payment from the United States after 1986, rather than on the statements made in securing the original contract prior to 1986, the Court will deny United Technologies' motion.

## I Background

The instant litigation stems from the formation and execution of a contract between Plaintiff the United States of America and Defendant United Technologies Corporation pursuant to which United Technologies provided the United States Air Force with jet engines. According to the Government complaint, from the 1970's until 1982, the Pratt and Whitney division of United Technologies (referred to hereinafter as "Pratt") was the Air Force's sole manufacturer and supplier of jet engines used in F–15 and F–16 fighter aircraft. Over time, the Air Force became dissatisfied with the allegedly high costs of purchasing and maintaining Pratt's engines. Therefore, the Air Force sought to have General Electric Company become an alternate supplier of F–15 and F–16 jet engines and began the process of negotiating new contracts.

Federal law allows the Government to dismiss with competitive bidding and to utilize negotiation in awarding contracts in the interest of "industrial mobilization." 10 U.S.C. § 2304(b)(1)(B). It is also noteworthy that when entering into contracts with the federal government worth more than a certain amount, contractors are required to divulge significant detail concerning the various elements that enter into the determination of the ultimate price. See the Truth in Negotiations Act (TINA), 10 U.S.C. § 2306a(1) & (7); and *Aerojet Solid Propulsion Company v. White*, 291 F.3d 1328, 1329 (Fed.Cir.2002). The Government claims against Pratt are rooted in part in various statutes, regulations and contract provisions enforcing TINA in negotiated contracts.

Having decided to award a new fighter engine contact by negotiation, in December, 1982, the Air Force provided General Electric and Pratt a draft of a document called a Request for Proposal, an initial step in awarding a negotiated government contract. See Keyes, *Government Contracts Under the Federal Acquisition Regulation*, § 15.11. The draft Request for Proposal initiated the process for selecting a source for the procurement of more than 2,000 jet engines to be delivered during fiscal years 1985–1990. On May 18, 1983, after considering General Electric and Pratt's responses to the draft proposal, the Air Force issued the actual Request for Proposal. Since the contract was to be awarded by negotiation rather than sealed bidding, the applicants were required to support their proposals with certified cost and pricing data, as required by the Competition in Contracting Act. 41 U.S.C. § 251, et seq., at § 254.

In August 1983, Pratt and General Electric each submitted their certified initial proposals for the contract. Pratt's submission included ceiling price quotes ("not to exceed" prices) from sole-source vendors from whom Pratt would be purchasing major parts and assemblies. Such

sole-source components comprised one of the largest cost elements in Pratt's proposal. Because Pratt would only negotiate contracts for these parts and assemblies after the primary contract was negotiated, Pratt was obliged to provide details concerning its expectations in negotiating initial prices as well as its expectations in negotiating lower prices with vendors over time. The lower prices to be achieved over time are referred to as "decremented positions." The personnel of Pratt's Procurement Cost Accounting Group were responsible for reviewing, evaluating, and providing a basis for the reasonableness of sub-contractor proposals over $100,000.

Pratt's Procurement Cost Accounting Group duly devised "ceiling quote decrement factors," percentages of total price for the various parts and assemblies representing the potential savings in performing the contract over time. However, Pratt did not rely entirely on its Procurement Cost Accounting Group's decrement factors in determining its certified best and final offer. Pratt certified that this was because of Pratt's "past experience in not being able to achieve [Procurement Cost Accounting Group]-recommendations at final settlement time." Doc. 1 ¶ 30. Pratt elaborated that "[w]hile we have incorporated a decremented position, we do not agree that the appropriate estimate should be based *solely* upon [Procurement Cost Accounting Group estimates], but rather *also* should consider past experience by supplier as indicated above." Doc. 1 ¶ 30.

Pratt submitted its best and final offer to the Air Force on December 5, 1983. As required by the Government Form 633 on which it was submitted, Pratt's best and final offer was supported by certified cost and pricing data. Part of this submission was United Technologies' Best and Final Offer Disclosure Item # 8, which listed "decrement factors" based upon Pratt's Procurement Contract Accounting Group

estimates. Pratt certified that its bid "reflects our best estimate and/or actual costs as of the date in accordance with the instructions of this form." On January 3, 1984, Pratt ostensibly complied with another government regulation demanding a certification of cost and pricing data by asserting the Pratt had submitted information "accurate, complete and current as of December 5, 1983."

In its Complaint, the United States alleges that Pratt knowingly understated the ceiling quote decrement factors for each major vendor set out in Item # 8 of its best and final offer. The Government alleges that Pratt has a computer database from which it could have retrieved and provided to the Air Force its actual "past experience" with suppliers, and that doing so would have revealed that the Procurement Cost Accounting Group-recommended price reductions were accurate. Because Pratt did not use the information contained in the database, Pratt's best and final offer contained false statements that its engine prices reflected Pratt's "best estimate and/or actual costs" and false statements concerning the "necessary and reasonable costs that in [Pratt's] best judgment [would] properly be incurred in efficient contract performance." Thus, the Government alleges, Pratt's costs were knowingly overstated, and its engine prices were therefore inflated. The United States further alleges that each bill, invoice, and price presented by Pratt to the Government from 1989 on reflected these inflations, as a result of that fraudulent conduct.

The United States has stated five causes of action against United Technologies: (1) violation of the False Claims Act, 31 U.S.C. § 3729(a)(1), for knowingly presenting or causing to be presented false or fraudulent claims to the United States; (2) violation of the False Claims Act, 31

U.S.C. § 3729(a)(2), for knowingly making, using, or causing to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the government; (3) a common law claim for breach of contract; (4) a common law claim for payment by mistake; and (5) a common law claim for unjust enrichment.

## II Analysis

The False Claims Act penalizes:

Any person who—

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; [or]

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government. . . .

31 U.S.C. § 3729(a). The False Claims Act currently defines the term "knowingly" in the following manner:

(b) Knowing and knowingly defined,- For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information-

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth or falsity of the information;

31 U.S.C. § 3729(b).

Until 1986, when Congress enacted the current "deliberate ignorance" standard of 31 U.S.C. § 3729(b), the Sixth Circuit had required proof of actual knowledge of falsity in order to establish a violation of the False Claims Act. *United States v. Murphy,* 937 F.2d 1032 (6th Cir.1991). The Government attempts to distinguish *Murphy,* pointing out that in that case, although the liability was premised on the filing of claims, *Murphy,* 937 F.2d at 1039, those claims were filed prior to the 1986 amendment. Doc. 104 ex. 1 ¶¶ 30–33. Thus, urges the Government, the question of whether or not basing liability on claims made after the amendment based on false statements made prior to the amendment is an open question in this circuit.

As the Third Circuit noted in analyzing the retroactive applicability of a revision in the same False Claims Act amendment to a bar on *qui tam* actions, the instant question was left open by the Supreme Court in 1997:

In *Hughes Aircraft Co. v. United States ex rel. Schumer,* 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997), the Supreme Court held that the 1986 amendments did not apply retroactively to conduct occurring prior to the amendment's effective date. The Court stated in a footnote, however, that since in *Hughes* both the "false claim submission" and the "disclosure to the government" of the fraud occurred before the effective date of the 1986 amendments, the Court did not have to address which of the two events should be used for determining retroactivity. 520 U.S. at 946, n. 4, 117 S.Ct. at 1876, n. 4.

\* \* \* \* \* \*

Although the parties sharply dispute whether there was "disclosure to the government" prior to the 1986 effective date, we need not resolve the issue. We conclude that even though the Supreme Court did not expressly reach in *Hughes* whether retroactivity is determined based on the submission date or the disclosure date, the Court's analysis strongly supports using the former, i.e., the date the allegedly false claim was submitted.

*United States ex rel. Cantekin v. University of Pittsburgh,* 192 F.3d 402, 409 (3rd Cir.1999).

In another *qui tam* case, the Ninth Circuit agreed with the Third Circuit's analysis:

> When we considered the unfair effect of the retroactive application of the 1986 amendment, that is to "subject [the defendant] to a cause of action that did not exist at the time it engaged in the conduct later made actionable," we concluded "the crucial event for purposes of non-retroactivity is the alleged presentation by [the defendant] of a false claim . . . ."

*United States ex rel. Newsham v. Lockheed Missiles & Space Co., Inc.*, 190 F.3d 963, 968 (9th Cir.1999) (quoting *Pettis ex rel. United States v. Morrison–Knudsen Co., Inc.*, 577 F.2d 668, 674 (9th Cir.1978)).

This Court is persuaded by the approach of the Third and Ninth Circuits, and adopts their analysis. Because liability in the instant case is premised upon the falsity of the claims for payment submitted after 1986, the Court will deny United Technologies' motion

## Conclusion

Because the Government accuses United Technologies of false claims submitted after 1986, United Technologies Corporation's Motion *in Limine* to Exclude Evidence of "Deliberate Ignorance" and "Reckless Disregard," Doc. 100, is **DENIED**.