# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

Nos. 02-3289/02-3482

_____

Owner-Operator Independent Drivers   *
Association, Inc., Individually and on   *
behalf of all others similarly situated;   *
Marshall Johnson; Jerry Vanboetzelaer, *
  *
    Appellants/Cross-Appellees,   *
  *
  *   Appeal and Cross-Appeal from the
  v.   *   United States District Court for the
  *   Western District of Missouri.
New Prime, Inc., doing business as   *
Prime Inc.; Success Leasing, Inc.,   *
  *
    Appellees/Cross-Appellants.   *

_____

Submitted: May 15, 2003
Filed: August 21, 2003

_____

Before WOLLMAN, MAGILL, and BEAM, Circuit Judges.

_____

MAGILL, Circuit Judge.

Plaintiffs-Appellants Owner-Operator Independent Drivers Association, Inc. ("OOIDA"), Jerry Vanboetzelaer ("Vanboetzelaer"), and Marshall Johnson ("Johnson") (collectively "Appellants") appeal the district court's[1] grants of summary

_____

[1]The Honorable Dean Whipple, Chief Judge, United States District Court for the Western District of Missouri.

judgment in favor of Defendants-Appellees New Prime, Inc. ("Prime") and Success Leasing, Inc. ("Success"). Appellants also appeal the district court's denial of class certification. Prime and Success cross-appeal the district court's dismissal of their state-law counterclaim against Johnson, asking for relief only if this court reverses.

Our jurisdiction is proper pursuant to 28 U.S.C. § 1291 (2000). We find that the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"), Pub. L. No. 104-88, 109 Stat. 803 (1995), is not retroactive and therefore does not grant a private right of action to parties of leases executed prior to the effective date of the ICCTA. Accordingly, we affirm.

## I.

OOIDA is a business association of owner-operators: individuals who own or control motor carrier equipment, such as a tractor unit, and lease the equipment, along with driving services, to a trucking company. Vanboetzelaer and Johnson are owner-operators and members of OOIDA. Prime is a regulated motor freight carrier, headquartered in Missouri and operating in forty-eight states. Success leases tractor units to independent owner-operators. Owner-operators lease tractor units from Success, and then lease the units, along with their services, back to Prime. Prime and Success have the same officers, directors, and shareholders.

An owner-operator ("Owner-Operator") who leases a tractor unit from Success signs a lease agreement ("Lease Agreement"), under which the Owner-Operator makes weekly rental payments and has an option to purchase the leased tractor. Prior to 1997, the Lease Agreement contained three provisions at issue in this appeal: (1) a Repair Reserve, under which Success retained $.035 per mile for tractor repairs in excess of $500; (2) a Tire Replacement Reserve, under which Success retained $.015 per mile for the purchase of tires; and (3) an Excess Mileage Account, under which Success retained $.05 per mile for mileage in excess of 2900 miles per week. The

Lease Agreement provided that if the lease was terminated early, the amount retained in the Repair Reserve and the Tire Replacement Reserve became the sole property of Success, and if the Owner-Operator completed the lease, exercised its option to purchase the tractor, or sold it to a third party, the unused funds would be divided equally between Success and the Owner-Operator. As to the Excess Mileage Account, the Lease Agreement provided that if the lease was terminated early, the amount retained became the sole property of Success, and if the Owner-Operator completed the lease, exercised its option to purchase the tractor, or sold it to a third party, Success would pay the Owner-Operator the entire amount retained for excess mileage.

In April 1997, Success amended the Lease Agreement by (1) eliminating the Repair Reserve; (2) providing that at the end of the lease or upon termination, the entire amount withheld in the Tire Replacement Reserve would be returned to the Owner-Operator, less costs attributable to wear on the tires; and (3) replacing the Excess Mileage Account with an excess mileage charge ("Excess Mileage Charge"), which requires an Owner-Operator to pay an additional sum for mileage over a certain amount, unless the Owner-Operator purchases the tractor unit or completes the lease, in which case an amount equal to the Excess Mileage Charge shall be paid back to the Owner-Operator.

In addition to the Lease Agreement, Owner-Operators sign a "Service Contract"[2] to lease their driving services to Prime. The Service Contract requires the Owner-Operator to provide a $1000 security deposit to ensure full performance of the lease obligations.

---

[2]This agreement is now known as an "Independent Operating Agreement."

Appellants claim that these three reserve accounts and the security deposit violate the Truth-in-Leasing regulations, see 49 C.F.R. Part 376 (2003). Specifically, Appellants claim that the withholding and retention of funds in these accounts and in the security deposit: (1) are improper because the lease documents fail to identify and provide an accounting of these "charge back items," in violation of 49 C.F.R. § 376.12(h); (2) are unauthorized deductions from compensation, in violation of § 376.12(i); and (3) are unauthorized deductions of escrow funds, in violation of § 376.12(k). We discuss the specifics of the parties' agreements below.

**1.    Vanboetzelaer**

Vanboetzelaer entered two sets of agreements at issue in this appeal. On October 5, 1992, Vanboetzelaer entered a Lease Agreement with Success and a Service Contract with Prime ("October 1992 Lease"). Under the Lease Agreement, Vanboetzelaer leased a tractor unit from Success for a period beginning on October 5, 1992, and ending January 18, 1994. Under the Service Contract, Vanboetzelaer leased the tractor unit back to Prime, along with his driving services.

Under the October 1992 Lease, Success withheld (1) $2894 for the Repair Reserve; (2) $1240 for the Tire Replacement Reserve; and (3) $866 for the Excess Mileage Account. Vanboetzelaer terminated this lease on February 20, 1993, and as a result, Success retained all of these withholdings, in accordance with the Lease Agreement. Success made no interest payments on any of these funds.

Upon termination of the October 1992 Lease, Vanboetzelaer entered a second Lease Agreement and Service Contract, covering a different tractor unit ("February 1993 Lease"). This agreement ran from February 20, 1993, until February 20, 1995, with an automatic one-year extension until February 20, 1996.

Under the February 1993 Lease, Success withheld (1) $20,184 for the Repair Reserve; (2) $2886 for the Tire Replacement Reserve; and (3) $7282 for the Excess Mileage Account. Vanboetzelaer completed his obligations under the lease on February 16, 1996, and subsequently exercised his right to purchase the tractor. In accordance with the Lease Agreement, Success returned to Vanboetzelaer half of the funds from the Repair Reserve and Tire Replacement Reserve and all of the funds from the Excess Mileage Account. Success made no interest payments on any of these funds. In addition, Prime retained Vanboetzelaer's $1000 security deposit, which he paid pursuant to the Service Contract.

## 2. Johnson

Johnson also entered two sets of agreements at issue in this appeal. On July 12, 1994, Johnson entered a Lease Agreement to lease a tractor unit from Success and a Service Contract with Prime to provide driving services from July 12, 1994, until August 16, 1995 ("July 1994 Lease"). Johnson terminated the July 1994 Lease on October 18, 1994, and Success retained all of the funds withheld for the Repair Reserve, the Tire Replacement Reserve, and the Excess Mileage Account; a total of $6469.

Upon termination of the July 1994 Lease, Johnson entered a second Lease Agreement, leasing a different tractor unit from Success, and a second Service Contract, leasing this tractor unit, along with his driving services, to Prime for a period from October 18, 1994, until October 18, 1996, with an automatic one-year extension until October 18, 1997 ("October 1994 Lease"). Johnson claims that he received a letter from Success written on Prime letterhead, terminating the October 1994 Lease, effective August 20, 1996. Prime and Success claim that Johnson prematurely terminated the October 1994 Lease on August 20, 1996. Upon termination, Success retained all funds withheld for the Repair Reserve, the Tire Replacement Reserve, and the Excess Mileage Account, a total of $17,945. Johnson

received no interest for the funds retained under the July 1994 Lease or the October 1994 Lease.

**B.**

On August 14, 1997, Vanboetzelaer, Johnson, and OOIDA filed a class-action complaint against Prime and Success, alleging violations of the Truth-in-Leasing regulations. The district court dismissed the complaint, concluding that the Federal Highway Administration ("FHWA") had primary jurisdiction because the claim involved matters within the agency's expertise. This court reversed and remanded, finding, inter alia, that the FHWA did not have exclusive jurisdiction over the claim. Owner-Operator Indep. Drivers Ass'n Inc. v. New Prime, Inc., 192 F.3d 778, 783-85 (8th Cir. 1999).

On remand, the district court denied Appellants' request for class certification, holding that certification under Federal Rule of Civil Procedure 23(b) was inappropriate because questions affecting individual members predominated over common questions of law or fact. Subsequently, the district court denied Appellants' request to file an interlocutory appeal challenging the denial of certification.

On January 22, 2002, the district court granted partial summary judgment for Prime and Success, holding that the ICCTA does not provide a private right of action for claims based on lease agreements that terminated before January 1, 1996, the effective date of the ICCTA. On August 2, 2002, the district court extended its holding, finding that the ICCTA could also not be applied retroactively to grant a private right of action based on lease agreements executed before January 1, 1996, thereby granting summary judgment for Prime and Success on the remainder of Vanboetzelaer's and Johnson's claims.

Subsequently, the district court granted summary judgment for Prime and Success on the remaining plaintiff's, OOIDA, claims for declaratory and injunctive relief, finding that (1) the amendments to the Lease Agreement mooted OOIDA's claims; (2) OOIDA lacked standing to challenge agreements entered after January 1, 1996, because it failed to show that any of its members entered into leases with Prime or Success after this date; and (3) the terms contained in the Lease Agreement, as it was amended in April 1997 ("Amended Lease Agreement"), are sound and legal. This appeal followed.

## II.

First, we examine whether the district court erred in holding that the ICCTA cannot be applied to conduct predating its enactment and thereby granting summary judgment in favor of Prime and Success on all of Vanboetzelaer's and Johnson's claims. We review a district court's grant of summary judgment de novo, applying the same standard as the district court. Caviness v. Nucor-Yamato Steel Co., 105 F.3d 1216, 1223 (8th Cir. 1997) (citation omitted). We will affirm only when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. Id. (citation omitted); Fed. R. Civ. P. 56(c) (2003).

## A.

The ICCTA transferred the motor carrier regulatory functions of the Interstate Commerce Commission ("ICC") to the Department of Transportation ("DOT") and the Surface Transportation Board ("STB"). See 49 U.S.C. § 13501. Within the DOT, the FHWA administers and enforces regulations regarding lease agreements between motor carriers and Owner-Operators, known as the Truth-in-Leasing regulations. See 49 C.F.R. Part 376.

Appellants claim that certain provisions of the Lease Agreements and Service Contracts violated the Truth-in-Leasing regulations. Appellants seek injunctive relief and damages under the following provisions of the ICCTA, entitled "Rights and remedies of persons injured by carriers or brokers":

> (a) In general. –
> (1) Enforcement of order. – A person injured because a carrier or broker providing transportation or service subject to jurisdiction under chapter 135 does not obey an order of the Secretary or the Board, as applicable, under this part, except an order for the payment of money, may bring a civil action to enforce that order under this subsection. A person may bring a civil action for injunctive relief for violations of sections 14102 and 14103.
> (2) Damages for violations. – A carrier or broker providing transportation or service subject to jurisdiction under chapter 135 is liable for damage sustained by a person as a result of an act or omission of that carrier or broker in violation of this part.

49 U.S.C. § 14704(a).

The ICCTA became effective on January 1, 1996. It is undisputed that all agreements between Appellants and either Prime or Success were executed prior to January 1, 1996. As a result, Prime and Success argue that Appellants may not bring an action under the ICCTA, as the claims at issue involve agreements which terminated before the effective date of the ICCTA, and the ICCTA was not intended to apply retroactively. Our task it to determine whether the ICCTA applies retroactively, an issue of first impression in our circuit.

**B.**

"[A] presumption against retroactive legislation is deeply rooted in our jurisprudence." Landgraf v. USI Film Prods., 511 U.S. 244, 265 (1994) (citation

omitted). The rationale for this presumption is that "[e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly." Id. As such, the Supreme Court has provided a framework for determining when a federal statute applies to conduct predating the statute's enactment. First, a court must determine if Congress has expressly prescribed the statute's proper reach. Id. at 280. If Congress has prescribed the reach, "there is no need to resort to judicial default rules." Id. If not, a court must examine whether the statute would have a retroactive effect; i.e., "whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." Id. If the statute would do any of these things, the presumption is that the statute does not govern, absent clear congressional intent otherwise. Id.

With regard to the ICCTA, Congress has not expressly prescribed the statute's reach. Therefore, we must proceed to the second step: whether application of the statute in this case would have a retroactive effect. We agree with the district court that private rights of action for damages based on the ICCTA are limited to actions involving agreements executed after the ICCTA's effective date; otherwise, the statute has a retroactive effect.

Prior to the ICCTA, only the ICC could bring claims against motor carriers for failure to comply with the applicable regulations. The ICCTA shifts this power and permits individual Owner-Operators to bring defendants directly into court. We find that this creates an impermissible retroactive effect.

This issue is analogous to the issue presented in Hughes Aircraft Co. v. United States, 520 U.S. 939 (1997), in which the Supreme Court held that when a statute expanded the class of plaintiffs who could bring claims, the statute altered the defendant's substantive rights and therefore had a retroactive effect. Id. at 950 ("In permitting actions by an expanded universe of plaintiffs with different incentives, the

-9-

[new statute] essentially creates a new cause of action, not just an increased likelihood that an existing cause of action will be pursued.") (citation omitted). Here, by permitting Owner-Operators to bring their own actions against motor carriers, the ICCTA expands the class of plaintiffs who could bring claims, thereby altering the motor carriers' substantive rights. But see Owner-Operator Indep. Drivers Ass'n, Inc. v. Arctic Express, Inc., No. 97-CV-750, 2003 WL 21645754 (S.D. Ohio July 11, 2003).

The Hughes Court also noted that individual plaintiffs will be motivated "primarily by prospects of monetary reward rather than the public good." 520 U.S. at 949. We find this to be the case here as well: Owner-Operators who sue motor carriers will likely be motivated by their own potential financial gain. This increases defendant motor carriers' potential liability, thereby creating a retroactive effect.

We find that the application of the ICCTA to the case at bar would result in a retroactive application of the statute, for which there is no evidence of congressional intent. Therefore, we agree with the district court that the ICCTA's private right of action is applicable only to leases executed after the effective date of the ICCTA. Accordingly, we affirm the grants of summary judgment in favor of Prime and Success with regard to Vanboetzelaer's and Johnson's claims, as all of their claims were based on leases and agreements executed prior to January 1, 1996.

## III.

Next, we examine whether the district court erred in granting summary judgment in favor of Prime and Success on OOIDA's claims for declaratory and injunctive relief. Again, we review a district court's grant of summary judgment de novo. Caviness, 105 F.3d at 1223 (citation omitted). We will affirm only when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. Id. (citation omitted); Fed. R. Civ. P. 56(c).

-10-

## A.

First, to the extent OOIDA seeks declaratory and injunctive relief based on leases executed prior to January 1, 1996, the effective date of the ICCTA, those claims are barred for the same reasons Vanboetzelaer's and Johnson's claims were barred, as discussed above. Therefore, we consider here only those claims of OOIDA regarding agreements executed after January 1, 1996. We divide those claims into two groups: (1) agreements entered from January 1, 1996, until April 1997, the effective date of the amendments to the Lease Agreement; and (2) agreements entered after the April 1997 amendments.

## B.

With respect to the agreements executed after January 1, 1996, but before April 1997, we find that OOIDA lacks standing. In order for an organization to have standing to assert the claims of its members, it must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977). OOIDA has presented no evidence of any OOIDA member that executed an agreement with either Prime or Success during this period. Because no member of OOIDA has standing to sue, OOIDA can not meet the requirements for organizational standing. Therefore, with respect to agreements entered between January 1, 1996, and April 1997, we affirm the district court's grant of summary judgment in favor of Prime and Success.

OOIDA also claims that the Amended Lease Agreement violates the Truth-in-Leasing regulations. The Amended Lease Agreement (1) contains no Repair Reserve; (2) provides that at the end of the lease or upon termination, the entire amount withheld in the Tire Replacement Reserve will be returned to the Owner-Operator, less costs attributable to wear on the tires; and (3) replaces the Excess Mileage Account with the Excess Mileage Charge, which requires an Owner-Operator to pay an additional sum for mileage over a certain amount, unless the Owner-Operator purchases the tractor unit or completes the lease, in which case an amount equal to the Excess Mileage Charge shall be paid back to the Lessee. OOIDA claims that the Set-Off provision of this Amended Lease Agreement makes the Tire Replacement Reserve and the Excess Mileage Charge escrow funds that do not comply with 49 C.F.R. § 376.12(k), the Truth-in-Leasing regulation governing escrow accounts. We discuss in turn the specifics of the relevant regulations, the Set-Off provision, and how this provision relates to the Tire Replacement Reserve and the Excess Mileage Charge.

**1.     The Regulations Governing Escrow Funds**

The Truth-in-Leasing regulation regarding escrow funds provides:

(k) Escrow funds. If escrow funds are required, the lease shall specify:
. . . .
(2) The specific items to which the escrow fund can be applied.
. . . .
(6) The conditions the lessor must fulfill in order to have the escrow fund returned. At the time of the return of the escrow fund, the authorized carrier may deduct monies for those obligations incurred by the lessor which have been previously specified in the lease, and shall provide a final accounting to the lessor or all such final deductions made to the escrow fund. The lease shall further specify that in no event shall

the escrow fund be returned later than 45 days from the date of termination.

49 C.F.R. § 376.12(k).

Escrow fund is defined as "[m]oney deposited by the lessor with either a third party or the lessee to guarantee performance, to repay advances, to cover repair expenses, to handle claims, to handle license and State permit costs, and for any other purposes mutually agreed upon by the lessor and the lessee." § 376.2(l). In other words, if the account is considered an escrow fund as defined above, the Amended Lease Agreement must: (1) specify what the funds held in escrow may be used for, § 376.12(k)(2); and (2) specify what items owed to Success at the termination or completion of the lease may be offset against any escrow funds to be returned to the Lessee, § 376.12(k)(6).

## 2. The Set-Off Provision

The Set-Off provision of the Amended Lease Agreement provides:

(a) Termination of Lease. If this Lease is terminated prior to the expiration of its term, You grant Success the right to require any carrier that You are leased with, and You shall so authorize that carrier, to off set against any amounts due You by the carrier an amount sufficient to cure any deficiencies in Lease charges, Tire Replacement Reserve, Excess Mileage Charges, or any other amounts due Success, by virtue of advances made on Your behalf for items referred to in paragraph 22, and to pay those amounts directly to Success.

(b) Completion of Lease. At the time You complete the full term of this Lease, You grant to Success the right to set off against any amounts due You from the Tire Replacement Reserve and any incentives earned by you for completion of this Lease, any amounts due Success by virtue of advances made on Your behalf for items referred

to in paragraph 22 under the terms of this Lease. Also, in the event the Tire Replacement Reserve has a negative balance, Success may set off from any incentives earned by You for completion of this Lease amounts sufficient to zero balance the Tire Replacement Reserve. You further authorize Success to offset against any amounts due You under the terms of this Lease, any amounts due the carrier to whom You are leased, and to remit such amounts to that carrier upon request.

Am. Lease Agreement, Appellants' App. at 417-18.

The Amended Lease Agreement explains that the Owner-Operator is responsible for certain financial obligations, described in detail, and that if Success advances funds to meet these obligations, then they may offset the amount owed the Owner-Operator upon termination or completion of the lease, as described above. The financial obligations are specified as: a Qualcomm unit, maintenance and repairs to the tractor unit, licenses, permits, taxes, non-trucking use auto liability insurance, loss or damage to the tractor, equipment missing or damaged upon return of the tractor unit, and costs associated with Prime's or Success's securing possession of the tractor unit, in the event the Owner-Operator does not voluntarily return the unit. OOIDA argues that offsets against the Tire Replacement Reserve and the Excess Mileage Charge are violations of the Truth-in-Leasing regulations because these accounts are actually escrow funds, and the Set-Off provision, as it relates to these accounts, fails to comply with the regulations governing escrow funds.

### a. The Tire Replacement Reserve

The Tire Replacement Reserve provides:

During the term of this Lease, You agree to place in a Tire Replacement Reserve an amount equal to 1.5 cents per mile that the Tractor travels. You shall authorize the Tire Replacement Reserve amount to be deducted from Your weekly Settlement by any carrier You

lease the Tractor to and remitted to Success, and You and Success will require that carrier to provide You with an accounting of the deductions or Success will do so as it receives the payments. You may demand an accounting of the amounts paid by You to the Tire Replacement Reserve at any time.

The Tire Replacement Reserve shall be used to purchase tires for the Tractor while the Lease is in effect. During that time, Success shall pay to You interest equal to the average yield on Ninety-One-Day Thirteen Week Treasury Bills as established in the weekly auction by the Department of Treasury. Interest shall be paid to You quarterly. Upon termination of this Lease, Success shall retain out of the Tire Replacement Reserve an amount equal to the cost attributable to the amount of wear on the tires which occurred during the time this Lease was in effect. The calculation of such costs shall be based on the wear of each tire measured in one thirty-seconds of an inch of useable tire remaining at the time of termination. Because the types of tires and their costs vary the resulting calculations may also vary and it is not possible to include an exact calculation of cost in this Lease. However, Success will make available to You upon request, all information necessary to calculate the cost to You attributable to wear on your tires at any given time. The balance of the Tire Replacement Reserve, less amounts set off as provided in paragraph 21, shall be paid to You. In the event You exercise Your option to purchase, all amounts accumulated in the Tire Replacement Reserve, less amounts set off as provided in paragraph 21, shall be paid to You. All amounts to be returned to You from the Tire Replacement Reserve, after authorized deductions, shall be returned within forty-five (45) days following termination of this Lease Agreement.

Am. Lease Agreement, Appellants' App. at 413-14.

OOIDA argues that the Tire Replacement Reserve is an escrow account subject to the Set-Off provision, and that allowing the offset of certain expenses against those escrow funds before they are returned violates § 376.12(k)(2) and (6) because it turns

that escrow into an all-purpose general fund. We agree that the Tire Replacement Reserve is an escrow fund; however, we disagree that the Set-Off provision turns the escrow into an all-purpose general fund or in any way violates the Truth-in-Leasing regulations.

Section 376.12(k)(2) requires that a lease agreement specify the "items to which the escrow fund can be applied." § 376.12(k)(2). The Amended Lease Agreement provides that these funds will be applied to tire expenses during the life of the lease. In addition, the Amended Lease Agreement expressly identifies those debts that an Owner-Operator may incur during the lease period that may offset items owed to the Owner-Operator at the termination of the lease. These debts include advances for the following items: the Qualcomm unit, maintenance and repairs, licenses, permits, taxes, insurance, loss or damage to the tractor, missing or damaged equipment, and costs associated with securing possession of the tractor unit.

We also find that the Set-Off provision does not violate § 376.12(k)(6), which requires the return of remaining escrow funds within forty-five days. The Tire Replacement Reserve funds are required, under the provisions of the Amended Lease Agreement, to be returned to the Owner-Operator within forty-five days. The fact that certain specifically enumerated items may offset the funds returned in no way violates this provision. For these reasons, we agree with the district court that the Tire Replacement Reserve in the Amended Lease Agreement does not violate the Truth-in-Leasing regulations.

### b.     The Excess Mileage Charge

The Excess Mileage Charge provides:

The Excess Mileage Charge is based on the accumulated average weekly miles the Tractor travels in excess of the mileage shown in Schedule A.

-16-

> The Excess Mileage Charge shall be adjusted and paid by You weekly based upon the average miles the Tractor travels. If You exercise Your option to purchase, Success shall pay to You an amount equal to the entire Excess Mileage Charge paid by You.

Am. Lease Agreement, Appellants' App. at 413.

We agree with the district court that the Excess Mileage Charge does not meet the definition of an escrow fund. Specifically, this charge does not create an account into which money is deposited for any of the purposes provided at 49 C.F.R. § 376.2(l). Instead, the purpose of these funds is to cover any decrease in value of the tractor unit based on excess mileage driven; it is not money deposited with the Lessor to which the Lessee has a valid claim. Therefore, the Excess Mileage Charge is not subject to the dictates of § 376.12(k).

## IV.

Appellants also argue that the district court erred in refusing to grant their motion for class certification. We review a district court's denial of class certification for abuse of discretion. Glover v. Standard Fed. Bank, 283 F.3d 953, 959 (8th Cir. 2002) (citation omitted).

The threshold requirements for class certification are: (1) the class is so numerous that joinder of all members is impractical; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). The district court found that the Appellants satisfied each of the requirements of Rule 23(a), and we agree.

In addition, Rule 23 requires the court to find that a class action is the appropriate vehicle through which to resolve the litigation, providing three situations in which a class action would be appropriate. Fed. R. Civ. P. 23(b). Because Appellants seek predominantly monetary relief, we agree with the district court that the applicable provision of Rule 23(b) that must be satisfied is the following:

> [T]he court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3).

We also agree with the district court that Appellants have not satisfied this provision, as questions affecting individual members of such a class would predominate over questions of law or fact common to the members.

As the district court pointed out, 49 U.S.C. § 14704(a)(2) provides a right to recover only to persons who have sustained damages as a result of a carrier violation. Therefore, neither Prime nor Success would be liable for returning funds if, for example, the Owner-Operator did not have a positive balance in his escrow account or the funds owed to the Owner-Operator were offset by other monies owed to Prime or Success. To make such determinations, a court would be required to examine each individual class member's account, including offsets, advances, and other items. Recovery for any plaintiff would be based on individual, not common, questions of

fact.  Therefore, we affirm the district court's denial of class certification, as we agree that questions affecting individual class members would predominate over common questions of law or fact.

## V.

Finally, regarding Prime and Success's cross-appeal of the district court's dismissal of their state law counterclaim against Johnson, we need not address this issue, as Prime and Success asked that the district court exercise supplemental jurisdiction over their claims only if this court reversed and remanded any of Appellants' claims.  Therefore, this issue is moot.

## VI.

For the foregoing reasons, we affirm the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.